Protass Law PLLC

260 Madison Avenue
22nd Floor
New York, NY 10016

T: 212-455-0335
F: 646-607-0760
hprotass@protasslaw.com

May 5, 2023

<u>VIA ECF</u>

Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:     <u>United States v. Mark Ross, Case No. 21-CR-193 (KAM)</u>

Dear Judge Matsumoto:

This firm represents Mark Ross in the referenced matter. We submit this letter memorandum and the attached exhibits in advance of Mr. Ross's May 19, 2023 sentencing hearing in the hope that they will aid this Court in concluding that a term of probation is the appropriate punishment for Mr. Ross.

<u>INTRODUCTION</u>

On October 31, 2022 Mr. Ross, age 55, pled guilty before this Court pursuant to a plea agreement with the government (the "Plea Agreement") to Count 1 of the original Indictment herein (the "Indictment") (Docket No. 1), which charged him (and three of his co-defendants) with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 with respect to Zona Energy, Inc. ("Zona Energy").[1] Mr. Ross very much understands and appreciates that he has no one other than himself to blame for his unlawful actions, for which he is both deeply ashamed and remorseful. He makes no excuses for, and accepts full responsibility for, his wrongful conduct (as he did when he pled guilty). Nothing submitted by or on behalf of Mr. Ross is intended to diminish or detract from the seriousness of his offense or his regret for his criminal conduct. As Mr. Ross put it in his letter to this Court, "I want you to know that I accept full responsibility for and am genuinely remorseful for (and humiliated about) my criminal conduct. What I did is entirely out-of-character for me, and I can assure you that I will never do anything like it again." (Exhibit 1.) Notably, Mr. Ross has already paid his $162,260 forfeiture obligation in full.

---

[1]     Count 1 of the Indictment also charged Mr. Ross (and the same three co-defendants) with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 with respect to OrgHarvest Inc. ("OrgHarvest"). Mr. Ross's Plea Agreement, though, relates only to Zona Energy.

Serious as his offense was, we still submit that probation would be both fair and just as well as sufficient, but not greater than necessary, to satisfy the penological objectives set forth in 18 U.S.C. § 3553(a). Among other things, probation would reflect the unique circumstances under which Mr. Ross became involved with his co-defendant, Richard Sterritt, the lies Sterritt told him (and his daughter, Naomi), his limited role in the conduct charged in the Indictment (as indicated by the 3-level downward adjustment in his Plea Agreement and the PSR for his minimal/minor role) as well as his heartbreaking personal story. Perhaps most importantly, a sentence of probation would account for the responsibility Mr. Ross bears for his daughter, Karlie, age 29, who suffers from Schizophrenia/Schizoaffective and Bipolar Disorders and who in June 2021 was released into Mr. Ross's custody and care after five years of state-mandated institutionalization.[2] Mr. Ross is the only member of his family who is able to care for Karlie because "she just doesn't trust or allow anyone else to help and provide for her." (Exhibit 1.) Providing that care is an arduous endeavor, requiring around-the-clock attention and management. As this Court might expect, Mr. Ross (and his family) deeply fears what would happen to Karlie if he were required to serve a term of imprisonment.

## ARGUMENT

### I.

### SENTENCING PROCEDURES AND STANDARDS

In *United States v. Booker*, 543 U.S. 220 (2005) the U.S. Supreme Court found that mandatory application of the Guidelines was unconstitutional and, as a remedial measure, excised 18 U.S.C. § 3553(b) from the Sentencing Reform Act of 1984. Thus, since *Booker*, sentencing in federal court has been governed entirely by 18 U.S.C. § 3553(a), pursuant to which the Guidelines are advisory only. District courts therefore must now consider all the 18 U.S.C. § 3553(a) sentencing factors in determining and imposing sentences that are "sufficient, but not greater than necessary" to achieve the purposes of sentencing. *Booker*, 543 U.S. at 245-46. *See also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable") (italics omitted); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("the Guidelines are no longer mandatory" and, thus, "sentencing judge[s] must consider the Guidelines and all of the other factors listed in section 3553(a)").

This Court therefore has broad "discretion to select an appropriate sentence, and in doing so [is] statutorily bound to consider the factors listed in § 3553(a)." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). *See also United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("A judge must respect all of the statutory criteria in order to mete out a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing) (internal quotation marks omitted); *Crosby*, 397 F.3d at 113 ("the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether" to impose a Guidelines or non-Guidelines sentence). In other words, this Court may consider its

---

[2]    By way of example only, Mr. Ross described how "Karlie is extremely paranoid and fixated on the Holocaust. I must reassure her several times a day that the Holocaust is over and that she and our family are safe. To this day she often wakes me up in the middle of the night fearful that she is in danger. I will sit by her bedside until she falls back to sleep." (Exhibit 1.)

"own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). In doing so, this Court must "make an individualized assessment based on the facts presented," which includes "a broad command to consider the nature and circumstances of the offense and the history and characteristics of the defendant." *Gall v. United States*, 552 U.S. 38, 50 & n.7 (2007) (internal quotation marks omitted). Thus, simply put, once an advisory Guidelines range has been calculated, "sentencing becomes a judgment call" for the Court. *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008).

II.

THIS COURT SHOULD FIND THAT MR. ROSS'S
ADVISORY GUIDELINES OFFENSE LEVEL IS 14

We submit that this Court should find that Mr. Ross's advisory Guidelines offense level is 14 (15 to 21 months imprisonment).

A.    The Advisory Guidelines Offense Level
Calculation In Mr. Ross's Plea Agreement

Mr. Ross's Plea Agreement provides for the following agreed-upon advisory Guidelines offense level calculation:

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Loss of More Than $550,000<br>(U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Minimal/Minor Participant<br>(U.S.S.G. § 3B1.2(b)) | -3 |
| Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| Total Adjusted Offense Level | 14 |

Mr. Ross and the government were not able to agree on the applicability of two other specific offense characteristics: (1) the enhancement for an offense involving ten or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)); and (2) the enhancement for use of "sophisticated means" (U.S.S.G. § 2B1.1(b)(1)(C)). As detailed below, we submit that Mr. Ross's advisory Guidelines offense level calculation should not include either enhancement.

Mr. Ross's Plea Agreement also provides for forfeiture of $162,260. Unlike most defendants in criminal cases involving financial frauds, Mr. Ross has already paid his forfeiture in full, which we submit concretely demonstrates both his acceptance of responsibility and remorse for his criminal conduct.

B.    The Probation Department's Calculation of
Mr. Ross's Advisory Guidelines Offense Level

On March 23, 2023 the Probation Department issued a draft PSR in which it asserts that Mr. Ross's advisory Guidelines offense level is 20 based on the following advisory Guidelines offense level calculation:

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Loss of More Than $550,000<br>(U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Offense Involving 10 or More Victims<br>(U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Violation of Prior Specific Judicial<br>or Administrative Order<br>(U.S.S.G. § 2B1.1(b)(9)(C)) | +2 |
| Use of Sophisticated Means<br>(U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Minor/Minimal Participant<br>(U.S.S.G. § 3B1.2(b)) | -3 |
| Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| Total Adjusted Offense Level | 20 |

On April 5, 2023 we submitted a letter to the Probation Department (Exhibit 2) objecting to the Probation Department's application of the following specific offense characteristics: (1) the enhancement for an offense involving ten or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)); (2) the enhancement for use of "sophisticated means" (U.S.S.G. § 2B1.1(b)(1)(C)); and (3) the enhancement for violation of a prior specific judicial or administrative order (U.S.S.G. § 2B1.1(b)(9)(C)).[3]

---

[3]    On May 5, 2023 the government submitted a letter to the Probation Department agreeing that the U.S.S.G. § 2B1.1(b)(9)(C) enhancement for violation of a prior specific judicial or administrative order should not be included in Mr. Ross's advisory Guidelines offense level calculation. We have not yet received the final PSR, though, so we do not yet know whether the Probation Department revised its advisory Guidelines offense level calculation for Mr. Ross to remove that enhancement.

C.    This Court Should Not Find That Mr. Ross's
      Offense Involved Ten or More Victims

Loss in any case involving financial fraud is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(a)(i). *See also* U.S.S.G. § 2B1.1, Application Note 3(a)(iv) (reasonably foreseeable pecuniary harm is the monetary harm "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense"). Two forms of causation are required for a finding of "reasonable foreseeability": (1) "but for" (or direct) causation; and (2) proximate causation. *See* U.S.S.G. Amendment 617 ("The amendment incorporates this causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation"); *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("the Guidelines does not hold defendants accountable only for certain or near-certain losses, but for losses that were 'reasonably foreseeable pecuniary harm'"); *United States v. Hartfield*, Case No. 10-CR-20144, 2015 WL 6158796, at *2 (D. Kan. Oct. 20, 2015) ("a district court must determine at sentencing whether the defendant's fraud was a 'but for' and legal cause of an investor's loss").

As to "but for" causation, the U.S. Court of Appeals for the Second Circuit (the "Second Circuit") has held that "the defendant's conduct must have been a necessary factor in bringing about the victim's harm." *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021). *See also United States v. Marino*, 654 F.3d 310, 322 (2d Cir. 2011) (noting that under the "cause in fact" or "but for" requirement, the government had shown that "[b]ut for appellant's role in affirmatively concealing [a Ponzi scheme], these investors would certainly not have" suffered losses). As to "proximate" causation, the Second Circuit has held that "the offense of conviction [must] directly and proximately harm[] the victim . . . . Courts have interpreted this language to impose cause-in-fact and proximate cause requirements, respectively." *Goodrich*, 12 F.4th at 229 (internal quotation marks omitted). Thus, "but for" causation is not enough to create liability because it "would unduly expand the scope of consequences for which [a defendant] would be responsible." *United States v. Muni*, 668 F.2d 87, 89-90 (2d Cir. 1981). Rather, "[b]oth the criminal and the civil law have circumscribed the range of consequences by considering an act to have been caused not simply when it was a physical consequence of the person's conduct but when, in addition, the actor either knew the consequence would occur or its occurrence was reasonably foreseeable." *Id. See also United States v. Devore*, Case No. 17-CR-00013, 2018 WL 6729679, at *1 (E.D. Tenn. Dec. 21, 2018) ("proof of factual cause by itself is insufficient to order restitution. The Government must also show that the type of harm suffered by the [victim] was a reasonably foreseeable consequence of Defendant's criminal behavior").

Here, the government and the Probation Department assert that a spreadsheet from Sterritt's office that was produced in discovery (the "Sterritt Spreadsheet") (Exhibit 3) lists the names of the investors to whom Mr. Ross recommended Zona Energy and, thus, the names of the victims of his offense. Because the Sterritt Spreadsheet contains the names of more than ten investors, the government and the Probation Department take the position that Mr. Ross's advisory Guidelines offense level calculation should include a two-level enhancement for an offense involving ten or more victims pursuant to Section 2B1.1(b)(2)(A)(i).

Using the Sterritt Spreadsheet as a basis for determining the number of victims, though, conflates "but for" and "proximate" causation. To demonstrate that difference we took the Sterritt Spreadsheet and created a chart (the "Ross Chart") (Exhibit 4) demonstrating the

relationships between Mr. Ross and the investors on the Sterritt Spreadsheet – that is, the investors to whom Mr. Ross recommended Zona Energy and the individuals to whom those investors, in turn, recommended Zona Energy (the "Downstream Investors").

According to the government and the Probation Department, all of the individuals listed on the Sterritt Spreadsheet and the Ross Chart should be counted as victims. But Mr. Ross was not the "proximate cause" of all of those individuals' Zona Energy investments. Rather:

- Mr. Ross recommended Zona Energy to two people – Jonathan Shane and Paul Ehrlich;[4]

- Jonathan Shane did not recommend Zona Energy to anyone;

- Paul Ehrlich recommended Zona Energy to five people (Joseph Surace, Adnan Duranni, Patti Schaen, Hussein/ Nisar Kermalli and Phil Sassower);

- Joseph Surace, Adnan Duranni and Hussein/Nisar Kermalli did not recommend Zona Energy to anyone else;

- Patti Schaen recommended Zona Energy to six people (Melvin Tannenbaum, Patricia Heffron, Phyllia Barasch, Sanford Miller, Samuel Gottlieb and Linda Halperin);

- Phil Sassower recommended Zona Energy to five people (John Loeb, Walter Pollock, Stanley Gilbert and Frederick Halperin).

(Exhibit 4.) Mr. Ross did not know any of the investors other than Paul Ehrlich, Patti Schaen and Jonathan Shane. And Mr. Ross only ever spoke with Adnan Durrani, Samuel Gottlieb, Nisar Kermalli and Melvyn Tannenbaum (though only after they had already made their Zona Energy investments).

Given the foregoing, Mr. Ross may have been the "but for" cause for the investments made by all the investors on the Sterritt Spreadsheet/Ross Chart because none of them would have purchased Zona Energy stock if it had not been for Mr. Ross. But Mr. Ross did not speak with any of the Downstream Investors (other than Adnan Durrani, Samuel Gottlieb, Nisar Kermalli and Melvyn Tannenbaum but only after they had already made their Zona Energy investments) and did not ask anyone to solicit the Zona Energy investments by them. He therefore was not the "proximate" cause of the Downstream Investors' Zona Energy investments. None of the investments made by any of the individuals listed on the Sterritt Spreadsheet/Ross Chart other than Paul Ehrlich and Jonathan Shane were therefore reasonably foreseeable to Mr. Ross. He therefore should not be held accountable for them when this Court determines the number of victims pursuant to Section 2B1.1(b)(2)(A)(i).

---

[4]    Paul Ehrlich's retirement account also made an investment in Zona Energy. (Exhibit 4.)

D.  This Court Should Not Find That Mr. Ross's
    Conduct Involved the Use of "Sophisticated Means"

The government and the Probation Department assert that Mr. Ross's advisory Guidelines offense level calculation should include a two-point enhancement for use of "sophisticated means" pursuant to Section 2B1.1(b)(10)(C). We submit that it should not.

Application Note 9(B) to Section 2B1.1(b)(10)(C) defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Thus, a "sophisticated means" enhancement is only "appropriate where the offense conduct, viewed as a whole, is notably more intricate than that of a garden-variety fraud scheme." *United States v. Bryson*, 101 F. Supp. 3d 147, 159 (D. Ct. 2015).

Mr. Ross did not disclose to potential Zona Energy investors that Sterritt intended to compensate him based on the number of Zona Energy shares purchased by the investors to whom he recommended Zona Energy (though Sterritt never compensated him as such). Though unlawful, Mr. Ross's conduct was not "especially complex" or "especially intricate." Rather, his actions amounted to garden-variety fraud – that is, the omission of material facts when speaking with potential investors. Conduct that is far more sophisticated and complex is necessary for application of a "sophisticated means" enhancement. *See*, *e.g.*, *United States v. Vaccarelli*, Case No. 20-CR-3748, 2021 WL 4805218, at *2 (2d Cir. Oct. 21, 2021) ("sophisticated means" enhancement applied because the defendant's conduct included "the creation and use of false documents"); *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) ("the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense"); *United States v. Amico*, 416 F.3d 163, 170 (2d Cir. 2005) ("sophisticated means" enhancement applied because the defendant "recommended strategies involving selection of certain loan documentation to reduce the likelihood that lenders would obtain from the Internal Revenue Service copies of the borrowers' tax returns and thereby discover the fraud").[5] Even Application Note 9(b) of Section 2B1.1 evidences the need for far more complex conduct.[6] Also, that Mr. Ross made the same omission to more than one potential Zona Energy investor does not make his conduct "sophisticated." *See United States v. Lewis*, 93 F.3d 1075, 1079 (2d Cir. 1996) ("repetitive conduct alone does not show the use of sophisticated means").[7]

---

[5]   *See also United States v. Bin Wen*, Case Nos. 17-CR-6173 (EAW), 17-CR-6174 (EAW), 2018 WL 6715828, at *15 (W.D.N.Y. Dec. 21, 2018) ("sophisticated means" enhancement applied because defendants "(1) used shell companies for the purpose of falsifying investments . . .; (2) had wholly fictitious individuals and/or unaffiliated individuals sign letters on fabricated letterhead on behalf of those shell companies; (3) deceived [victims] about the ways in which their credentials and names were being used; and (4) created false email addresses, phone numbers, and fax numbers to perpetuate their fraud").

[6]   Application Note 9(b) to Section 2B1.1 provides examples of "sophisticated means," including a "telemarketing scheme" in which "the main office of the scheme [is] in one jurisdiction but . . . solicit[ation] operations [are] in another jurisdiction." It also provides that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

[7]   The government's May 5, 2023 letter to the Probation Department assets that a "sophisticated means" enhancement should be included in Mr. Ross's advisory Guidelines

Given the foregoing, Mr. Ross should not be held accountable for having used "sophisticated means" in committing his offense of conviction and no enhancement pursuant to Section 2B1.1(b)(10)(C) should be included in his advisory Guidelines offense level calculation.

E.    This Court Should Not Find That Mr. Ross Violated
      a Prior Specific Judicial or Administrative Order

The Probation Department (but not the government) asserts that Mr. Ross's advisory Guidelines offense level calculation should include a two-point enhancement pursuant to Section 2B1.1(b)(9)(C) for having committed an offense involving "a violation of" a "prior, specific judicial or administrative order, injunction, decree, or process not addressed otherwise in the Guidelines." (PSR ¶ 99.) In particular, the Probation Department asserts that that enhancement applies because "on August 12, 2008, FINRA revoked Ross's securities license. However, Ross since participated in securities fraud, in direct contradiction of FINRA." (*Id.*) We submit that the Probation Department is wrong.

Initially, the Probation Department conflates two related but separate regulatory events. First, in November 2007 (approximately 15 years ago) Mr. Ross entered into a Letter of Acceptance, Waiver and Consent (the "AWC") with FINRA. (Exhibit 5.) That AWC provided for the imposition of the following sanctions for the regulatory violations detailed therein: (1) a two-year suspension from association with any member firm in a principal capacity; (2) a 90-day suspension from association with any member firm in any capacity (running fully concurrent with the two-year principal association suspension); (3) a $35,000 fine; and (4) a requirement that Mr. Ross complete sixteen hours of anti-money laundering training per year for two years. Second, approximately nine months later, FINRA revoked Mr. Ross's securities license for failing to pay the aforementioned $35,000 fine in full. (Exhibit 6.)

Here, Mr. Ross did not violate any of the sanctions imposed on him because neither the AWC nor FINRA's license revocation included an injunction or other order prohibiting future violations of the federal securities laws (like settlement of an SEC enforcement action would). And, Mr. Ross does not satisfy the circumstances under which such an enhancement could apply without an injunction, to wit, when a "prior order (1) imposed a

---

offense level calculation for several reasons. First, the government asserts that Mr. Ross used an alias – "Richard Richman." In fact, Sterritt, not Mr. Ross, used the alias "Richard Richman." Second, the government asserts that Mr. Ross forwarded a fraudulent Zona Energy PowerPoint to potential investors. Mr. Ross only believed, though, that that PowerPoint was outdated (though it may well also have been fraudulent). Third, the government asserts that Mr. Ross was paid money from a variety of shell accounts. Mr. Ross, though, had nothing to do with the accounts from which he was paid. Fourth, the government asserts that Mr. Ross concealed the purpose of his arrangement with Sterritt through a phony consulting agreement. Even if that consulting agreement was phony (and we do not concede that it was), Mr. Ross's conduct in recommending Zona Energy to potential investors had nothing to do with his consulting agreement. Rather, obviously, the individuals to whom he recommended Zona Energy knew it was Mr. Ross that was making that recommendation. The government also asserts that Mr. Ross's offense involved "sophisticated means" because he purportedly owned OrgHarvest shares though a trust account. In fact, Mr. Ross did not own OrgHarvest stock in a trust (though he does not know if any of his co-defendants owned their OrgHarvest stock in a trust).

concrete punishment, such as a fine, on the defendant for the same or similar conduct at issue in the defendant's subsequent offense; (2) imposed prospective, remedial conditions or obligations, like practice monitoring and the filing of quarterly reports . . . that were reasonably calculated to curtail future instances of the conduct at issue; *and* (3) nevertheless the defendant perpetrated that prohibited conduct while the order was still in effect." *United States v. Iley*, 914 F.3d 1274, 1281 (10th Cir. 2019) (emphasis added). Also, the AWC provides that Mr. Ross did not "admit[] or deny[] the findings" in the AWC and that he entered into the AWC "solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or as to which FINRA is a party." (Exhibit 5.) And, the AWC did not involve any "adjudication of any issue of law or fact" underlying the securities law violations that FINRA was investigating. (*Id.*)

Revocation of Mr. Ross's securities license also was not a "prior, specific judicial or administrative order, injunction, decree, or process not addressed otherwise in the Guidelines." Rather, it was what it was – a license revocation. And, even if a securities license revocation is a "prior, specific judicial or administrative order, injunction, decree, or process not addressed otherwise in the Guidelines" (which, again, it is not), Mr. Ross's offense conduct had nothing to do with his former securities license – that is, he was not acting as an investment advisor, was not acting as a principal of FINRA member firm and was not associated with any FINRA member firm.

Given the foregoing, Mr. Ross did not violate any prior "judicial or administrative order, injunction, decree, or process" in committing his offense of conviction. Indeed, even the government (in its May 5, 2023 letter to the Probation Department) agrees that an enhancement pursuant to Section 2B1.1(b)(9)(C) should not be included in Mr. Ross's advisory Guidelines offense level calculation. His advisory Guidelines offense level calculation therefore should not include the two-point enhancement pursuant to Section 2B1.1(b)(9)(C).[8]

F.     This Court Should Find that Ms. Ross's
       Advisory Guidelines Offense Level is 14

Given the foregoing, this Court should find that Mr. Ross's advisory Guidelines offense level is 14. Also, this Court should find that Mr. Ross has no criminal history points and therefore falls in Criminal History Category I. We therefore submit that this Court should find that Mr. Ross's advisory Guidelines range of imprisonment is 15 to 21 months.

---

[8]     Mr. Ross's FINRA regulatory history is somewhat akin to criminal history under the Guidelines. As regards criminal history, Application Note 1 to Section 4A1.1 provides that, in calculating a defendant's criminal history score, "[c]ertain prior sentences are not counted," including "[a] sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense."

Here, the Probation Department seeks to add two levels to Mr. Ross's advisory Guidelines offense level pursuant to Section 2B1.1(b)(9)(C) for a regulatory violation that took place more than fifteen years ago. If that regulatory violation had been a prior criminal conviction, it would not be considered in calculating Mr. Ross's criminal history score. We therefore submit that the exercise of appropriate discretion favors its non-consideration in calculating Mr. Ross's advisory Guidelines offense level.

III.

## THIS COURT SHOULD CONSIDER THE U.S. SENTENCING COMMISSION'S APRIL 2023 PROPOSED AMENDMENTS TO THE GUIDELINES IN SENTENCING MR. ROSS

In April 2023 the U.S. Sentencing Commission (the "Sentencing Commission") announced its 2023 proposed amendments to the Guidelines. *See* U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines* (Apr. 27, 2003) (found at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (last visited May 5, 2023) (the "Amendments"). Although the Amendments will not become effective until November 1, 2023 (unless Congress enacts legislation to modify or reject them), this Court can and should consider them in sentencing Mr. Ross.

Most significantly, the Sentencing Commission proposed a new Guidelines section – Section 4C1.1 ("Adjustment for Certain Zero-Point Offenders") – providing for a stand-alone 2-level reduction for defendants like Mr. Ross "who did not receive any criminal history points under Chapter Four, Part A and whose instant offense did not involve specified aggravating factors." *Id.* at 79. In particular, defendants like Mr. Ross who satisfy all of the following ten criteria will be entitled to that 2-level reduction pursuant to Section 4C1.1:

- Defendants who did not receive any criminal history points from Chapter Four, Part A;

- Defendants who did not receive an adjustment under Section 3A1.4 (Terrorism);

- Defendants who did not use violence or credible threats of violence in connection with their offense;

- Defendants who did not commit an offense that resulted in death or serious bodily injury;

- Defendants who did not commit a sex offense;

- Defendants who did not personally cause substantial financial hardship;

- Defendants who did not possess, receive, purchase, transport, transfer, sell or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with their offense;

- Defendants whose offense of conviction is not covered by Section 2H1.1 (Offenses Involving Individual Rights);

10

- Defendants who did not receive a Section 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or Section 3A1.5 (Serious Human Rights Offense) enhancement; and

- Defendants who did not receive Section 3B1.1 (Aggravating Role) enhancement and who were not engaged in a continuing criminal enterprise (as defined in 21 U.S.C. § 848).

*Id.* at 87. Mr. Ross satisfies all ten criteria for application of the Sentencing Commission's new Section 4C1.1.[9] Thus, if sentenced after November 1, 2023, Mr. Ross's advisory Guidelines offense level would be 12 (not 14), which indicates a 10 to 16 month (not 15 to 21 month) term of imprisonment.

Also, the Sentencing Commission proposed a change to the Commentary to Section 5C1.1 ("Imposition of a Term of Imprisonment"), providing that "a sentence other than a sentence of imprisonment . . . is *generally appropriate*" for defendants with advisory Guidelines offense levels that fall within Zone A (Levels 1 to 8) and Zone B (Levels 9 to 11) of the Sentencing Table. *Id.* at 92 (emphasis added). Although it does not fall within Zone A or Zone B of the Sentencing Table, Level 12 is the next level up from the highest offense level (Level 11) for which a non-custodial sentence would be "generally appropriate."

---

[9]     The Sentencing Commission's only Section 4C1.1 criteria that could even potentially be at issue for Mr. Ross is the requirement that the offense not have caused "substantial financial hardship." As to that criteria, the Sentencing Commission directed courts to "consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to" Section 2B1.1, which provides that courts should consider the following in determining whether an offense "resulted in substantial financial hardship to a victim": (A) becoming insolvent; (B) filing for bankruptcy; (C) suffering substantial loss of a retirement, education or other savings or investment fund; (D) making substantial changes to his or her employment, such as postponing his or her retirement plans; (E) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; or (F) suffering substantial harm to his or her ability to obtain credit. We are not aware of any information or evidence indicating that Mr. Ross's conduct resulted in any of the foregoing for any of the victims of his offense. We therefore submit that Mr. Ross did not cause "substantial financial hardship" to any of the victims of his offense.

IV.

THIS COURT SHOULD SENTENCE
MR. ROSS TO PROBATION

We respectfully submit that, based on the 18 U.S.C. § 3553(a) sentencing factors, this Court should sentence Mr. Ross to probation.[10]

A.    A Term of Probation Accurately Accounts for
Mr. Ross's Painful and Heartbreaking Life Story[11]

Mr. Ross's life story shows all the signs of inter-generational trauma – that is, adverse or traumatic events or experiences that are passed down from one generation to the next, often in unspoken and deeply complex ways. For Mr. Ross that inter-generational trauma involves a tragic blend of mental illness, physical illness, death, divorce, alcoholism and substance abuse. Even the Probation Department recognized Mr. Ross's inter-generational trauma in writing that grounds exist for imposition of a non-Guidelines sentence:

> The Defendant has undergone hardship by losing a sibling at a young age, witnessing the breakdown of his parents' marriage because of that loss and other adverse factors, including the parents' alcoholism and moving often throughout his upbringing. Additionally, in his adulthood, the defendant has witnessed his child be diagnosed with, and nearly died from, stage four cancer, and he has another child with significant mental health conditions that require intensive care.

(PSR at 36.)

Mr. Ross was raised in Manhattan until his sister, Leslie, died of sepsis when he was 7 or 8 years old. *See* Exhibit 7 ("Leslie . . . tragically passed away at the age of six from a blood disorder. My brother [Mr. Ross], who is the middle child, at even a very young age, stayed strong as an example to me and a support to my grieving parents"). Mr. Ross has one other sister, Tara Orbe, with whom he has a loving relationship and with whom he speaks "all the time." With Mr. Ross's help, Tara survived Juvenile Rheumatoid Arthritis. *Id.* ("At a very young age of nine, adversity struck our family again. I was diagnosed with Juvenile Rheumatoid Arthritis. My treatment was aggressive and uncomfortable. I had to wear braces on all of my extremities. My memories of rehabilitation and how I was able to stay motivated to recover[] was the steadfast support of my brother"). Like his daughter, Madeline (as detailed below), Ms. Orbe also survived Hodgkin's Lymphoma, with which she was diagnosed at age 18. *Id.* ("My brother stood by me

---

[10]    Given the minimal/minor role that he played in the Zona Energy fraud and the fact that he is the first of his co-defendants to be sentenced, no term of imprisonment is necessary pursuant to 18 U.S.C. § 3553(a)(6) to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

[11]    Mr. Ross's personal history and characteristics are detailed in Paragraphs 116 to 130 of the PSR.

every step of the way to support my recovery. . . . To this day, his supervision is what lead me to conquer anything"). *See also* Exhibit 8 ("When his sister, Tara, was diagnosed with Stage 3 Hodgkins Disease he was always by her side to keep her company, cheer her up as much as possible, and just be there to love and support her"); Exhibit 9 ("Throughout [his sister's] ordeal, [Mr. Ross] was kind, loving and patient and helped his parents with everything and supported his sister"). Mr. Ross also has one half-sibling from his father's second marriage, Samantha Prate, with whom he is also close. Although both of his parents have passed away, Mr. Ross still maintains a close relationship with his father's second wife, Linda Amori, who "is like a mother figure" to him.

Due to his parents "need to escape Manhattan because of the discomfort" arising from his sister's death, Mr. Ross's family moved when he was approximately 7 or 8 years old to Dutchess County, NY (for approximately two years) and Scarsdale, NY (for approximately five years). Following his parents' divorce (when he was 14 years old), Mr. Ross moved with his mother back to Manhattan (for approximately one year), to Greenwich, CT (where he graduated high school) and then back to Manhattan (for approximately another two years). Mr. Ross's parents turned to drinking to soothe their suffering from their daughter's death. Mr. Ross described his parents' alcoholism as "scary" because they were drunk "every night." At the same time, he was subjected to physical abuse at the hands of his father, who hit him with an open hand on the face and "took a hammer and hit [him] in the legs and knees 'out of nowhere' to test if he had the same disease as his sister, who . . . bruised differently than [him] whenever struck with a hammer." Mr. Ross also witnessed his mother suffer similar physical abuse at the hands of his father, including hits to her head with a shoe, the breaking of her wrist and her treatment at hospital "a couple of times." As an adult Mr. Ross developed an "extremely close" relationship with his mother, who he described as his "best friend." His relationship with his father, though, was "off and on," particularly after they went into business together because his father was "domineering and had a strong personality." Both of Mr. Ross's parents have now passed away and he is today the patriarch of his extended family.

Mr. Ross and his ex-wife, Jayne, married in 1988 and divorced in 2013, after which Mr. Ross moved to California and remarried, though that relationship also ended in divorce. Today, Mr. Ross and Jayne are living together again (in Parkland, FL) and working to rebuild their relationship. They are "best friends" and plan to re-marry (Exhibit 10). Most importantly, Mr. Ross and Jayne are co-parenting their four children – Madeline (age 33), Karlie (age 29), Naomi (age 27) and Adin (age 22). *See* Exhibit 11 (Mr. Ross and Jayne "separated ways for a period of time, but it was the love of their family and for one another that brought them back together, again. They are a unit . . . a team. They came together to continue to support their four children as the children's needs varied in different ways and at different times").

Madeline – At age 18 Madeline was diagnosed with Stage 4 Hodgkin's Lymphoma. Mr. Ross moved to New York to be with her as she received treatment at Memorial Sloan Kettering Cancer Center. Jayne described that time as follows: "During this particularly difficult and challenging time in our lives, Mark was my rock. He essentially moved to New York, where he took Madeline to chemotherapy, radiation and provided her with full-time care while I stayed home in Florida with our other three children. I was anxious and fearful. Fortunately, Mark was strong, positive and committed, pouring his heart and soul into helping us to save our daughter." (Exhibit 10.) As a result of her cancer diagnosis and treatment, Madeline "developed negative self-thoughts" and, starting at age 18, developed addictions to heroin,

13

methamphetamine, cocaine and fentanyl. Though she has been through at least fifteen rehabilitation centers, Madeline is still battling the demons underlying her addictions. She has overdosed and almost died five times, including one overdose in October 2022 (while the instant matter has been pending) for which she was hospitalized and on life support for three weeks. As Madeline described her own situation:

> [M]y father has had to watch me battle my own demons shortly after I beat cancer. I started to spiral out of control due to my drug addiction. I had a decade-long battle with heroin and fentanyl, and my father, helpless, had to watch me from the sidelines once again, battle and fight for my life. I've overdosed five times in my life and in the past year ended up in the hospital on life-support due to this terrible disease. . . . [M]y father has endured so much worrying about his children, and with Karlie's and my case worrying about our lives and whether or not we were going to live or die. I remember one day my father told me he would wake up in the middle of the night on multiple occasions, having a panic attack; shaking and out of breath because he would experience recurring nightmares of seeing my lifeless body on that metal table in the morgue because he was deeply concerned that I was going to eventually end up dead.

(Exhibit 12.) Notwithstanding all the heartache she caused, Mr. Ross and Madeline (who lives at home with Mr. Ross and Jayne) share a "very close relationship." (*Id.*)

Karlie – At age 18 Karlie was diagnosed with Schizophrenia/Schizoaffective and Bipolar Disorder after a psychotic episode in which she attacked her younger brother, Adin (who was 11 years old), with a knife. In June 2021 Karlie was released into Mr. Ross's custody and care after five years of state-mandated confinement at a psychiatric hospital in California. While institutionalized, Karlie "had difficulties with the staff . . . because she is 'very high maintenance.'" She "is ornery and can become violent and bullyish." And, although Mr. Ross "did not know her to be suffering inside state custody because she has a very happy personality," he "suffered because she was a ward of the State." In addition to the care that he provides for Karlie (detailed below), Mr. Ross "prevents her from running away" and "protects her from making inappropriate statements related to her paranoid delusions in public." Mr. Ross does take Karlie "around the community but is cautious of her because she is aggressive and inappropriate with strangers." Again, Karlie "just doesn't trust or allow anyone" other than Mr. Ross "to help and provide for her." (Exhibit 1.) And, again, providing that care requires around-the-clock attention and management. (*Id.*) Mr. Ross's wife, Jayne, reported that she "cannot handle" Karlie (who also lives at home) without Mr. Ross's "help." (Exhibit 10.)[12]

---

[12]    *See also* Exhibit 13 ("Mark is on 24-hour call to help his daughter Karlie . . . . Having her father around is of extreme importance to the household"); Exhibit 14 ("To impose any kind of sentence that would prevent him from the task of full time caregiver [for Karlie] would be devastating to her safety, and growth"); Exhibit 8 ("Mark is the bedrock of his family, which would definitely fall apart if he was taken away from them").

<u>Naomi</u> – Mr. Ross's third daughter, Naomi, lives in Boca Raton, FL and is finishing her certification to become a yoga instructor. She has "an 'extremely close' relationship" with Mr. Ross and speaks with him several times a week. As detailed below, Naomi wrote of "how co-defendant Richard Dale Sterritt, Jr. pursued a romantic relationship with her, and but for that circumstance, [Mr. Ross] would not have ever met co-defendant Sterritt, Jr., and [Mr. Ross] would not have ever committed the instant offense." Naomi describes her relationship with her father as follows:

> My dad is my best friend. He has a heart of gold and has emulated pure selflessness for as long as I can remember. He has always been there for me, whether it be during the good times in my life or the more challenging moments. But no matter what, I can wholeheartedly say that my father has never let me down.
>
> *     *     *     *
>
> My father has impacted my life greatly. He taught me so much about life and its many challenges. His everlasting strength and bravery continue to inspire me every day. . . . He is my rock, role model, and best friend.

(Exhibit 15.)

<u>Adin</u> – Mr. Ross's son, Adin, lives in Miami, FL, where he is a successful online influencer, streamer and gamer. *See* Exhibit 16 ("Adin is a bit of an anomaly in the social media and gaming landscape that has built a massive following and unparalleled engagement by carving out a niche on [] popular social media platform[s]"). Adin wrote that he would not have achieved success if it had not been for Mr. Ross's support when he first started getting involved in online communities as a teenager, writing the following about his father:

> It is because of my dad that I inherited his undeniably amazing work ethic, the drive to pursue my dreams of becoming a streamer . . . . He would always advise me to consider the advice of what others were recommending, but in the end he reassured me to always follow my dreams, so that's exactly what I did. And for that, I am eternally grateful to him.

(Exhibit 17.) Indeed, when others told Mr. Ross that he "was wasting his money by supporting" Adin, "my dad put his foot down and stuck up for me as he stood my me." (*Id.*) As Adin described it, "none of my success in life" would have been possible without Mr. Ross. (*Id.*) [13]

---

[13]     *See also* Exhibit 18 ("In the thirty years I have known Mark he has faced with many challenges to include his first born being diagnosed with Cancer in 2005 as his sister Tara [] was when she was a teenager. Through these times he showed no weakness as he knew he had to push on for his family and stand strong for them").

There can be no question that Mr. Ross has lived a difficult life. For the sake of his family, though, he remained strong and supportive for them. He still has many challenges ahead, including the many serious issues that his daughters, Madeline and Karlie, face. We do not mean to suggest that this Court should sentence Mr. Ross to probation because of the trials and tribulations he has faced throughout his life. But we do submit that the "broad command to consider," among other things, "the history and characteristics of the defendant" when determining and imposing sentence favors a sentence of probation. *Gall*, 552 U.S. at 50 & n.7 (internal quotation marks omitted).

B.    A Term of Probation Would Allow Mr. Ross to Continue
          <u>Providing Critical Care for His Daughter, Karlie</u>

In 2011 when she was 18 years old, Mr. Ross's daughter, Karlie, was diagnosed with Schizophrenia/Schizoaffective and Bipolar Disorder after the psychotic episode in which she attacked her younger brother, Adin, with a knife. As described by Adin:

> My second oldest sister, Karlie, was diagnosed with schizoaffective disorder at around age 18. It's been extraordinarily painful having to watch Karlie struggle with all sorts of issues associated with her severe mental illness. When I was 11 years old I suffered a very traumatic experience during one of Karlie's psychotic episodes. She believed that I wasn't really her brother, but in fact, a Nazi soldier impersonating her brother. I'll never forget being woken up in the middle of the night to Karlie stabbing me in my arm. I was so scared and confused especially because at that age I wasn't able to truly comprehend the gravity of the situation and how sick Karlie really was. I was just in complete and utter shock as to why my big sister would do such a horrific thing to me and cause me harm.

(Exhibit 17.) Karlie's attack on Adin was the "catalyst that led to a series of disastrous events that ultimately resulted in Karlie's institutionalization." (*Id.*) In June 2021, after five years of state-mandated institutionalization, Mr. Ross succeeded in securing Karlie's release into his custody and care.

Karlie's mental illness is heartbreaking for Mr. Ross's entire family. That tragedy would only be compounded if Mr. Ross is required to serve a prison term because he is the center of Karlie's world, the only member of his family capable of providing her with the around-the-clock care that she needs and the only member of his family who is actually able to provide the care that she needs because Karlie "just doesn't trust or allow anyone else to help and provide for her." (Exhibit 1.) The words written by Mr. Ross's family speak for themselves as to the irreplaceable role Mr. Ross plays in Karlie's life. For example, Mr. Ross's wife, Jayne, wrote the following:

> Mark and I . . . are the primary caregiver for our daughter, Karlie, who needs hands-on care 24/7 because of her severe psychiatric issues. And Mark provides the vast majority of that care for Karlie not only because of his patience, care and understanding but also

>because he is just very good at it. Better than me, I must say. I cannot imagine what life would be like for Karlie should Mark be sentenced to prison. . . . [S]he seems to suffer far less as long as Mark is with her. He is Karlie's guide. He is Karlie's light. . . . Mark, not me, picks Karlie up every day from the outpatient treatment program in which she is enrolled. It is Mark, not me, who takes her to her doctors' appointments, psychiatric appointments, the dentist, the pharmacy and anything else she needs. I simply cannot manage Karlie's care on my own. And I am terrified that she will again become a ward of the state if she is not able to receive the care and support that she needs and is currently receiving at home, all because of who Mark is and what he does for Karlie.

(Exhibit 10.) Likewise, Mr. Ross's daughter, Naomi, wrote the following:

>While Karlie spent six long years [in a psychiatric hospital], my father put his heart and soul into doing whatever it would take to get Karlie out of this prison she had been in. Once she was released, my father volunteered to be her main caretaker. He currently provides and dispense[s] various medications to Karlie throughout the day, in conjunction with the 24/7 supervision that she needs and that he personally oversees.

(Exhibit 15.) And, Mr. Ross's daughter, Madeline, wrote:

>It had been my father's mission to get Karlie out of the mental facility even if it was the last thing he could do. Once she was released a few years ago it was a common understanding that she needed 24/7 supervision and my father plays a very instrumental role in the daily care of my sister. . . . [My] father is her main caretaker. He dispenses her medications, drives her to her outpatient programs and supervises her on a daily basis to make sure she does not get herself into any trouble.

(Exhibit 12.) *See also* Exhibit 14 ("To impose any kind of sentence that would prevent [Mr. Ross] from the task of full time caregiver [to Karlie] would be devastating to her safety and growth"); Exhibit 11 ("Karlie continues to need focused care for her mental health challenges. Mark has been a primary caregiver. A term of imprisonment puts tremendous stress on the family unit . . . . Karlie's care and mental health may be compromised in the absence of Mark's presence").

We do not seek to exaggerate the degree of Karlie's mental illness or Mr. Ross's importance in providing her with care. But the fact is that Karlie suffers from a severe mental disorder that requires around-the-clock care. It is Mr. Ross who provides that care and insures that she is able to live with her family around her, rather than in a psychiatric institution.

C.    A Term of Probation Will Afford Mr. Ross the Best Opportunity
To Continue Recovering From His Own Substance Abuse Issues

As detailed in Paragraphs 136 to 140 of the PSR, Mr. Ross, like his parents and his daughter, Madeline, has long suffered from substance abuse issues, including the abuse of Xanax, Adderall and alcohol.[14] He also became addicted to opiates (Oxycodone, Oxycontin and Fentanyl) after an automobile accident in 1995. In October 2021, though, Mr. Ross reached out to Jayne and told her that he "needed help." As Jayne described it, "Mark realized the problems he was having and how they were spinning out of control. He knew he had to stop and he knew that he would need help beyond me to successfully stop." (Exhibit 10.) Fortunately, Mr. Ross got that help. He was admitted to "a week-long medical detoxification program and two weeks of treatment thereafter at Recovery First" in Hollywood, FL. He has been clean and sober ever since. Mr. Ross very much looks forward to remaining clean and sober and to a lifetime of recovery work. Although the BOP offers the RDAP Program, there is often (depending on the facility and the number of qualified inmates) a long wait list for RDAP admission. Moreover, it is our understanding that the BOP does not admit inmates to the RDAP program if sentenced to less than 27 months imprisonment. In any event, Mr. Ross would receive better treatment and support outside of a prison setting. We therefore submit that a sentence of probation will afford Mr. Ross the best opportunity to continue his recovery work from his substance abuse issues.[15]

---

[14]    Mr. Ross used cocaine (occasionally until 2019) and marijuana (until 2012). He also experimented on a couple of occasions with LSD and mescaline in his 20s.

[15]    A sentence of probation would also allow Mr. Ross to address the mental health conditions from which he suffers (as detailed in the November 2022 letter submitted by Crystal Adams of Brighter Life Psychiatry), including Bipolar Disorder, Major Depressive Disorder, Post-Traumatic Stress Disorder and Generalized Anxiety Disorder. (Exhibit 20.) (Mr. Ross was also diagnosed as suffering from and treated for ADHD and depression approximately 15 years ago.) *See also* Exhibit 12 ("When the COVID pandemic hit, it was during this period of time that my father really began demonstrating behaviors which lead me to believe he was dealing with undiagnosed and untreated mental illness, which we later found out to be the case when he was clinically diagnosed [with] Bipolar Disorder. I remember around the time when the crime he had committed had taken place that he was not in a mentally healthy state of mind"). To treat these conditions, Mr. Ross takes Vraylar (for his Bipolar Disorder), Lithium Carbonate ER (for his Bipolar Disorder), Quetlapine Fumarate (for anxiety and insomnia) and Clonazepam (for anxiety and feelings of panic). (Exhibit 20.)

It also bears noting that the CDC has stated that "mood disorders, including depression" can "make you more likely to get very sick from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 5, 2023). A sentence of probation would eliminate the risk that he will contract COVID-19 while in prison. *See United States v. Johnson*, Case No. 98-CR-860 (ARR), 2021 WL 5755047, at *4 (E.D.N.Y. Dec. 3, 2021) (high infection rates in prison facilities are "the natural outgrowth of carceral settings, where people cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment"); *United States v. Skelos*, Case No. 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. Apr. 12, 2020) ("[j]ails and prisons are powder kegs for infection. People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene,

D.    A Term of Probation Accurately Reflects the
Nature and Circumstances of Mr. Ross's Offense

Mr. Ross offers no excuse or justification for having engaged in the securities fraud conspiracy for which he pled guilty. And, again, he is deeply remorseful for and accepts full responsibility for his criminal conduct. Still, we submit that a sentence of probation accurately reflects the nature and circumstances of his offense.

Initially, any understanding of Mr. Ross's offense conduct requires an understanding of the facts and circumstances underlying his introduction to, involvement with and work for Sterritt, as detailed in the letter submitted by Mr. Ross's daughter, Naomi (Exhibit 15), and in Mr. Ross's letter (Exhibit 1).

In May 2019 Naomi (when she was 23 years old) was working as a waitress at an Italian restaurant in Las Vegas, NV when a "friendly customer" – Richard Sterritt, who was holding himself out as "Richard Richman" and who was decades older than her – began what appeared to be a courtship but that ultimately turned out to be a lie-filled manipulation. (Exhibit 15.) Sterritt told Naomi that she had the perfect personality to work for one of his friends in Los Angeles, CA. (*Id.*) Sterritt asked her if she was happy in her relationship. (*Id.*) And Sterritt gave her his telephone number, telling Naomi to call if she "ever found [herself] in a position that [she] wanted out" of her relationship. (*Id.*) Following a weekend of fights with her boyfriend and feeling trapped because she did not have the money or transportation to leave the apartment she shared with that boyfriend, Naomi called Sterritt and told him that she was interested in the job in Los Angeles he had mentioned. (*Id.*) As Naomi described it:

> During the following weekend, my boyfriend and I had another big fight and he threatened to kick me out. Feeling lost and confused, I reached out to Richard and asked him if the job he had mentioned was still available and if so, I would be interested in taking the position. Richard asked me if I was in need of funds for a car to transport myself and my belongings to Los Angeles and I gratefully accepted. Immediately, Richard gave me $2,000 and I left the very next day.

(*Id.*) Sterritt, despite living in Dallas, TX, "managed to get [Naomi] a room in West Hollywood at his nephew's house," where she stayed for approximately one month (*Id.*) After returning from a trip to Northern California, though, "to my surprise, Richard had moved me into a fully furnished apartment" – a purported act of kindness that left her "feeling so incredibly free from the toxic environment and relationship that I had gotten out of." (*Id.*) Naomi felt that Sterritt genuinely wanted to help her and to see her succeed. (*Id.*) She did, of course, question Sterritt's motive. (*Id.*) She questioned whether Sterritt had romantic feelings for her (particularly given their age difference) or whether he was "just an altruistic human being." (*Id.*) Ultimately, Naomi came to believe, based on what he did and said, that Sterritt "was the answer to mine and my family's prayers." (*Id.*) It was not until several years later, though, that Naomi came to "realize[] just how painfully wrong I had been." (*Id.*)

---

wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment").

19

Shortly after arriving in Los Angeles, Sterritt visited Naomi and asked her to dinner. (*Id.*) She thought that dinner "was the least I could do considering he was essentially the reason I was able to move away from the toxic situation in Las Vegas and why I had my own place now to live." (*Id.*) In response to Sterritt's questioning over dinner, Naomi opened up. She told Sterritt about her family, her childhood and all the challenges that she and her family had endured. (*Id.*) She mentioned Mr. Ross's "ugly divorce" from his second wife and how her parents were in the process of reconciling. (*Id.*) Naomi reported that Sterritt "seemed rather curious and without interruption kept asking me questions about my dad and his past experiences." (*Id.*) Sterritt "then told me he was interested in speaking to my father at some point." (*Id.*) Naomi thought that Sterritt was just making conversation and that "the idea would blow over eventually." (*Id.*) But Sterritt "was persistent for several months, asking numerous times to speak with" Mr. Ross. (*Id.*) Again, Naomi "questioned" Sterritt's "intent because no one [had] ever treated me that kindly before." (*Id.*) She "couldn't figure out whether he actually wanted to help me or if he had an ulterior motive behind his actions." (*Id.*) Ultimately, after getting to know him better, Naomi came to "truly believe[] [Sterritt] just had a big heart." (*Id.*) Also, Sterritt spoke with Naomi "about his businesses and how successful they were and for once I felt relieved and hopeful that this man" – Sterritt – "would help my family." (*Id.*) *See also* Exhibit 1 ("Naomi described him to me as a billionaire philanthropist who she had met a few months earlier while she was working at a restaurant in Las Vegas"). In what ultimately amounted to a sophisticated con, Sterritt "made life-changing promises to" Naomi, causing her to "gr[o]w excited that he was going to make things better for me and my family." (Exhibit 15.) As a result, Naomi "grew closer to [Sterritt] and began talking to him every day, sharing more and more. He knew about all my heartache and hardships and he was someone I felt like I could confide in and vice versa." (*Id.*)

In addition to telling him about Mr. Ross's divorce, Naomi spoke with Sterritt "about my sister, Karlie, who suffers from severe mental illness." (*Id.*) Again, Sterritt "took interest." (*Id.*) At that time Karlie was still confined to a psychiatric hospital in Fresno, CA, about three hours from Los Angeles. (*Id.*) As Naomi described it:

> One day, Richard asked me if I wanted to take a trip with him to visit my sister. This caused me to break down because I never had a single person care for me or my family as much as he did. Without hesitation, I took Richard's offer to go see my sister. He gave me money to buy my sister, Karlie, clothes, makeup and everything else she wanted. He offered to do it all and then some. I remember having conversations with my dad and I would ask, "where did this person come from?" My dad would tell me, he either really wants something from me or maybe he's just a really good person.

(*Id.*) Continuing the impression that he genuinely cared for Naomi and her family, Sterritt "offered to buy a property in Destin, FL and open a ranch for my sister, Karlie, where she could live with various animals something to the effect of an animal sanctuary and she could be safe. He mentioned getting bodyguards and assuring me that it would be a place where [Karlie] would not be in danger and would be able to lead as much of a normal life as possible." (*Id.*) For Naomi, "[t]his was what sealed the deal." (*Id.*) She "felt this tremendous bond with this man like no other." (*Id.*) Mr. Ross described his own experience with the foregoing events as follows:

It was mid 2019 when I was going through my second divorce, I was unemployed and struggling on many fronts. My youngest daughter, Naomi, introduced me to a man named Richard Richman, who I later would learn was not Richard Richman but was, in fact, Richard Sterritt. Naomi described him to me as a billionaire philanthropist who she had met a few months earlier while she was working at a restaurant in Las Vegas. She told me that Richard had helped her financially so that she could move out of the home she was sharing with her boyfriend at the time and get away from the abusive relationship with that boyfriend. Naomi told me that she had had long and intimate discussions with Richard about my situation, including the situation involving my daughter, Karlie. Naomi told me that Richard wanted to help me and that I should call him.

(Exhibit 1.)

As they "grew closer and closer," Sterritt "offered" Naomi "his apartment in [Los Angeles], as he was never really there." (Exhibit 15.) She "took this opportunity and moved in, and even moved [her] younger brother [Adin] in shortly after." (*Id.*) She came to "believe[], as well as my family, that [Sterritt] had feelings for me and truly cared about me." (*Id.*) As Sterritt intended from the beginning, Naomi "began to let my guard down more and more and eventually I put my full trust in this man." (*Id.*) And "[t]his is when [Naomi] ultimately arranged a call for [her] dad and [Sterritt] to meet and talk with one another." (*Id.*) In addition to all the foregoing, Sterritt "offered my dad [Mr. Ross] money, which he declined because my father would rather work for his earnings, and not take a free handout. My dad is a hard worker and has always been a career driven man." (*Id.*) Still, Mr. Ross took Naomi up on the offer to speak with Sterritt and described his first interaction with Sterritt around May 2019 as follows:

[I called Richard. He offered to send me money, with no strings attached, to help me get back on my feet. I turned down his offer though because I was not looking for a handout. Rather, I wanted a job and asked Richard if he would hire me to work for him in some capacity. . . . Richard hired me as a shareholder relations manager for Zona Energy. Richard told me that Zona Energy was about to go public and that I would need to speak with the roughly 500 Zona Energy shareholders to keep them informed of the company's status and progress. . . . I recall feeling as though I had met a real-life angel as I was so down on my luck.

(Exhibit 1). Mr. Ross thereafter began work for Sterritt and ultimately committed the offense for which he pled guilty.

Naomi deeply regrets allowing Sterritt into her life, deeply regrets having believed Sterritt's lies, deeply regrets having been victimized by Sterritt. Of all her regrets, though, Naomi most regrets introducing her father, Mr. Ross, to Sterritt. She holds herself responsible for Mr. Ross's legal problems because she knows that he would never have engaged in the criminal conduct for which he pled guilty if she had never introduced him to Sterritt

because he had no prior relationship with Sterritt and no prior knowledge of Zona Energy (or OrgHarvest). Sterritt, by contrast, no doubt would have engaged in the criminal conduct for which he was charged even if he had never met Mr. Ross. As Naomi wrote:

> Had I known then what I know now, I would have never let this man near myself, let alone my father and the rest of my family. You hear these stories of people being gaslighted and manipulated but you don't think that could ever happen to you or that they come in the form of someone that looked like Richard. This is one of my biggest regrets in life, putting my trust in this man and believing he truly cared about my family's and my own well-being.

(Exhibit 15.) Or, as Bentley Singer, who met Sterritt through Naomi, wrote about Sterritt:

> [T]he man who Naomi introduced me to as Richard Richmon[] is [] very manipulative and sells a story. He is a true cunning salesman and takes advantage of good people like Mark and others that I have personal knowledge of. Richard sells his story of success and hope for good people trying to provide for their family the right way. Mark is not the only person that I know of that Richard was trying to exploit. I have seen it first-hand on a diabolical level.
>
> \*     \*     \*     \*
>
> Richard was so good at figuring out what people wanted and how he can manipulate them into getting what he needed from them. He used the things that [they] wanted to blind them to what he was actually doing.

(Exhibit 20.) A few other points also bear noting. Unlike his co-defendants, Mr. Ross did not know Sterritt's true identity (or criminal history) until it was publicly disclosed in January 2020.[16] Mr. Ross had no prior relationship with and had not previously worked for/with Sterritt (unlike his co-defendants, who knew and worked for Sterritt for years or even decades). And Mr. Ross worked remotely (in Parkland, FL) from Sterritt's base of operations (in Dallas, TX). He therefore was not exposed to or aware of what took place at Sterritt's office on a day-to-day basis.

   <u>Second</u>, Mr. Ross's advisory Guidelines offense level calculation includes a 3-level downward adjustment pursuant to Section 3B1.2(b) for his minimal/minor role because he played minimal/minor role in the conduct charged in the Indictment, which obviously reflects on the nature and circumstances of his offense conduct.

---

[16] When Sterritt's true identity was disclosed, he again lied, telling Mr. Ross "that he had been working undercover for the CIA in the past and that he had to change his name to remain safe from the individuals he had helped put behind bars. (Exhibit 1.)

Third, the loss associated with Mr. Ross's offense (between $550,000 and $1,500,000) is responsible for 14 of the 17 "points" making up his advisory Guidelines offense level (before the 3-level reduction for acceptance of responsibility). In other words, the loss associated with Mr. Ross's criminal conduct is responsible for more than 80% of his advisory Guidelines offense level. That advisory Guidelines offense level and the loss on which it is principally based demonstrates an oft-criticized aspect of the Guidelines – the disconnect between the range of imprisonment indicated by the amount of loss and a defendant's personal culpability, particularly for defendants like Mr. Ross, who played a minimal/minor role in charged criminal conduct. As the Court put it in *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D. Va. 2005):

> [F]ashioning a just sentence cannot be reduced to a mere arithmetical exercise. Reliance solely on numbers, quantities, offense levels, criminal history categories, and matrices produces an illusory precision that obscures the fact that sentencing . . . must involve the exercise of judgment, *i.e.*, a judge's discerning opinion that results from identifying and weighing fairly all of the factors relevant to achieving the statutory sentencing goals.

*Id.* at 594. Or, as the Honorable Jed S. Rakoff wrote in *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012):

> Imposing a sentence on a fellow human . . . requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. . . . [H]uman beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

*See also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation as to "why it is appropriate to accord such huge weight to [this] factor[]"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds").

The foregoing is especially true with respect to Section 2B1.1's loss table, which is "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *Emmenegger*, 329 F. Supp. 2d at 427. When adopted in 1987, the fraud section of the Guidelines (then Section 2F1.1) provided for just five specific offense characteristics (other than loss).[17]

---

[17]    The original fraud section of the Guidelines included only the following specific offense characteristics: (A) more than minimal planning; (B) more than one victim; (C) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious

Today, by contrast, Section 2B1.1 includes nearly thirty different specific offense characteristics. Still, the Sentencing Commission has "never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *Adelson*, 441 F. Supp. 2d at 510 (quoting Kate Stith & José Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) (emphasis in original). Furthermore, the Sentencing Commission has failed to address the fact that many of the specific offense characteristics in Section 2B1.1 replicate and/or overlap with the concept of loss, with one another and with other Chapter 3 adjustments. The Sentencing Commission itself even acknowledged that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform*, at 137 (Nov. 2004). But, while the Sentencing Commission has identified what it labels "factor creep," it has not acted to evaluate which specific offense characteristics might be cumulative and whether its ever-expanding list of specific offense characteristics produces prison terms greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Because of that distortion and because of the Sentencing Commission's failure to remedy Guidelines "factor creep," a number of district courts have refused to impose sentences within Guidelines ranges for fraud offenders. *See, e.g.*, *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (describing how that the Guidelines in securities fraud cases "are patently absurd on their face" due to the "piling on of points" under Section 2B1.1). *Adelson*, 441 F. Supp. 2d at 506, 510 (the "calculations under the Sentencing Guidelines lead to a result [an effective life sentence] so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law"; describing Section 2B1.1's overlapping enhancements as the irrational "piling on of points"). Simply put, the loss table in Section 2B1.1 is "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring) (emphasis added).

Here, Mr. Ross's offense level includes a 14-level increase based on the more loss associated with his criminal conduct. That 14-level increase, though, distorts his advisory Guidelines offense level calculation by significantly increasing his indicated range of imprisonment (particularly if this Court accepts all the specific offense characteristics that the Probation Department included in its advisory Guidelines offense level calculation). This inherent absurdity is further evidenced by the fact that the loss herein would have generated an 8 (not 14) level increase under the original 1987 version of the Guidelines.[18]

---

or political organization or government agency; (D) the violation of a judicial or administrative order; and/or (E) the use of foreign bank accounts/transactions to conceal the nature or extent of the fraudulent conduct. *See* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_A-C.pdf (last visited May 5, 2023).

[18]    *See* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_A-C.pdf (last visited May 5, 2023).

This Court is required, of course, to consider Mr. Ross's advisory Guidelines offense level and indicated range of imprisonment as its "starting point" in determining and imposing sentence. But Mr. Ross's advisory Guidelines offense level, based as it is principally on the amount of loss associated with his offense of conviction, is a highly imperfect measure of offense seriousness, the role he played in his offense of conviction and the nature/circumstances of his offense. As the court put it in *United States v. Ranum*, 353 F. Supp. 2d. 984, 990 (E.D. Wis. 2005), "[o]ne of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level . . . . [F]rom the victim's perspective, the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference."

Fourth, Mr. Ross is different than most persons convicted of securities fraud offenses. He does not work (and has not worked for more than 15 years) in the securities industry. He does not hold any securities licenses. He does not now and has never served as an officer or director of a publicly traded company. And, given the injunction to which he will be subjected when he settles the enforcement action initiated by the SEC on the day he was arrested and charged (which he will have to do because of his guilty plea herein), Mr. Ross will be legally prohibited from committing the same or any similar offense in the future.

Finally, notwithstanding his criminal conduct, and without diminishing his full acceptance of responsibility, Mr. Ross, as reflected by the letters submitted on his behalf, is an honest, trustworthy and reliable man:

- "[H]aving practiced psychiatry which gave me great insight into individuals I came into contact with . . . [w]ithout reservation I can attest that Mark Ross is an honest, trustworthy, humble individual who has an unblemished history and his uncharacteristic behavior in this matter is an aberration of character" (Exhibit 21);

- Mr. Ross "taught me how to treat people with dignity and respect no matter who they are or where they came from, and most importantly, he taught me how to be loving, loyal, respectful, kind, and how to work hard and make money due to his fervent work ethic" (Exhibit 17); and

- Mr. Ross "is a man of moral character who has lived to support those around him" (Exhibit 7).

Given all the foregoing, we submit that this Court should, regardless of his advisory Guidelines offense level and, more particularly, the effect of the loss amount on his advisory Guidelines offense calculation, sentence Mr. Ross to probation.

E.     A Term of Probation Is Sufficient, But Not
       Greater Than Necessary, to Promote Respect
       for the Law and Provide Just Punishment

Mr. Ross deeply regrets his criminal conduct – regret that is reflected in his prompt admission of his wrongdoing and prompt guilty plea, payment of his entire forfeiture obligation before sentencing and the shame and humiliation associated with his offense of conviction. Indeed, and without repeating it here, Mr. Ross's letter to this Court expresses his genuine remorse, regret and contrition for his offenses of conviction. Also (with the exception of his conduct herein), Mr. Ross has led a law-abiding life, largely dedicated to his family (who he very much loves and supports) and to the care of his daughters, Karlie and Madeline. We offer the following observations of Mr. Ross's remorse, regret, shame and acceptance of responsibility as evidence that probation is sufficient, but not greater than necessary, to promote Mr. Ross's respect for the law and provide him with just punishment:

- "These past couple of years he has had the time to really do some serious self-reflection and understands that what he did was very wrong. I see my father has a tremendous amount of guilt regarding everything. He feels so badly for what he has done and he has shared with me that he so badly wishes he could change the past" (Exhibit 15);

- "I spoke to Mark regarding this matter and he is very distraught and remorseful and is at a loss how he allowed himself to do such a thing" (Exhibit 21);

- "Mark has always been straightforward and honest with me in speaking about what he did. He never sugar-coated it. I know from our discussions that he feels tremendous remorse and regret for what he did. Indeed, he apologized to me for the impact of what he did on his life and the life we are trying to rebuild as well as the effect his conduct will have on our children" (Exhibit 10);

- "Mark has told me how remorseful he is for what he did and how badly he wishes things would have been different . . . . Mark accepts responsibility as he always has in his life whether good or bad" (Exhibit 22);

- Mr. Ross's "penitence for" his criminal conduct "is unfathomable. He respectfully accepts responsibility for his role in this situation" (Exhibit 7); and

- "Mark outrightly expressed deep remorse and takes accountability. Mark has expressed remorse to me, personally, about the situation. He has expressed his goal of restitution. Pay it back" (Exhibit 11).

26

*See*, *e.g.*, *United States v. Alatsas*, Case No. 06-CR-473 (JBW), 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing sentence of probation on a defendant convicted of conspiracy to commit loan application fraud notwithstanding a Guidelines range of 24 to 30 months imprisonment based, in part, on a finding that "[s]pecific deterrence is provided by the shame created by the felony conviction, the cost of defense and strict restitution requirements. General deterrence is also sufficiently satisfied by the sentence").

> F.    A Term of Probation Is Sufficient, But Not Greater Than
> Necessary, to Afford Adequate Deterrence to Criminal Conduct
> <u>and Protect the Public From Further Offenses by Mr. Ross</u>

Mr. Ross is not now and has not for more than 15 years been involved in the securities industry. Moreover, the SEC initiated an enforcement action against him on the same day that the government arrested and charged him. Because of his guilty plea, Mr. Ross has no choice but to settle the SEC's enforcement action, which settlement will include: (1) an injunction prohibiting any future violation of any federal securities laws; (2) an injunction prohibiting any future direct or indirect participation in any offering of unregistered securities; (3) disgorgement of ill-gotten gains; (4) a civil monetary penalty; (5) a bar prohibiting service as an officer or director of a public company; and (6) a "penny stock" bar. Additionally, Mr. Ross promptly pled guilty, admitted his criminal conduct and accepted full responsibility for his actions. He understands that his conduct was wrong and is deeply remorseful for what he did.

We therefore submit that probation is more than sufficient, but not greater than necessary, to deter Mr. Ross from further criminal conduct and protect the public from future crimes because he will never again be in a position to commit the same or any similar offense. *See*, *e.g.*, *United States v. Walden*, 470 F.3d 735, 739-40 (8th Cir. 2006) (affirming below Guidelines on a defendant convicted of mail fraud in part because of defendant's low likelihood of recidivism); *United States v. Butler*, 264 F.R.D. 37, 40 (E.D.N.Y. 2010) (imposing non-Guidelines sentence in part because defendant's "loss of his securities license, probably his ability to work in the financial sector, and the impact of this conviction on his employability" combined with the conclusion that it "is unlikely he will engage in further criminal activity in light of his continuing supervision, the need to provide for his wife and young son, and the support of his family and many friends and associates").

<u>CONCLUSION</u>

Mr. Ross is a good man who did a bad thing, not a bad man who did a bad thing. He regrets, is remorseful for and accepts full responsibility for his criminal conduct. He has already paid his $162,260 forfeiture obligation in full. He played a minimal/minor role in the criminal conduct charged in the Indictment. He poses no threat to any individual or the community at large. And he is at very low risk of committing the same or any similar offense again. Also, Mr. Ross would not have committed his offense of conviction had he not met Sterritt through his daughter, Naomi. Most importantly, Mr. Ross plays an irreplaceable role in the life of his daughter, Karlie. We therefore submit that, for Mr. Ross, "no right-minded observer would regard" a sentence of probation "under these circumstances as a windfall." *United States v. Mongelli*, Case No. 02-CR-307 (NGG), 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020). Put differently, no term of imprisonment is needed to satisfy any of the 18 U.S.C.

§ 3553(a) sentencing factors. Rather, probation for Mr. Ross would be the "right result" for the "right defendant" under the "right circumstances" and for the "right reasons."

Accordingly and for all the foregoing reasons, we respectfully request that this Court sentence Mr. Ross to a term of probation.[19]

Thank you for your consideration and attention to this matter.

Respectfully submitted,

PROTASS LAW PLLC

By: _____
        Harlan Protass

260 Madison Avenue
22nd Floor
New York, NY 10016
T. 212-455-0335
F. 646-607-0760
hprotass@protasslaw.com

*Counsel for Defendant Mark Ross*

Encls.

cc:     All Counsel of Record (via ECF)

        Frank Nikolaidis (via e-mail w/ encls.)
        United States Probation Officer

---

[19] If this Court sentences Mr. Ross to a term of imprisonment, we respectfully request that it: (A) recommend to the BOP that it designate him to the minimum-security satellite prison camp at FCI Miami in Miami, FL so that he can be near his family, who live nearby in Parkland, FL; (B) recommend to the BOP that it admit him to the RDAP Program at FCI Miami to address his substance abuse issues; and (C) direct that he be permitted to self-surrender to the BOP facility to which he is designated (whether FCI Miami or otherwise).