UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED STATES OF AMERICA

    -against-                                     21 CR 193 (KAM)

RICHARD STERRITT,

                           *Defendant.*
-------------------------------------------------------------------x

## <u>RICHARD STERRITT'S SENTENCING MEMORANDUM</u>

ROBERT CALIENDO, ESQ.
31 West 34th St., 7th Floor
New York, NY 10001
Tel. (646) 668-5615
rc@caliendo-law.com

*Attorney for Richard Sterritt*

# **TABLE OF CONTENTS**

INTRODUCTION.................................................................................................. 3

THE CHARGES................................................................................................... 3

THE OFFENSE CONDUCT .............................................................................. 4

THE GUIDELINES............................................................................................. 8

THE COURT MUST REJECT THE INTENDED LOSS FIGURE....................... 11

THE COURT MUST REJECT THE ACTUAL LOSS FIGURE ............................ 17

SECTION 3553 COMPELS LENIENCY ...................................................... 19

EXTREME PRETRIAL CONFINEMENT MERITS LENIENCY......................... 20

CONCLUSION ................................................................................................. 27

## INTRODUCTION

Richard Sterritt respectfully submits this sentencing memorandum addressing the charges, offense conduct, sentencing guidelines, loss arguments, and § 3553 variance grounds, including Sterritt's health and pre-trial confinement conditions.

## THE CHARGES

On Nov. 27, 2023, Sterritt pled guilty to all "charges" in the "superseding indictment" with "no [plea] agreement." Plea Tr. at 18, 21 (11/27/23); ECF No. 177 (S1 indictment). Sentencing is set for June 27, 2025. *See,* 3/27/25, 4/23/25, and 5/1/25 Dkt. Entries. No count has a mandatory minimum. He pled to:

- Count one: securities fraud conspiracy per 15 USC § 78j(b);
  - Max. prison: five years per 18 USC § 371;
  - Max. supervised release: three years per 18 USC § 3583(b)(2);

- Count two: wire fraud conspiracy per 18 USC § 1343;
  - Max. prison: twenty years per 18 USC § 1343;
  - Max. supervised release: three years per 18 USC § 3583(b)(2);

- Count three: (Zona Energy) securities fraud per 15 USC § 78j(b);
  - Max. prison: twenty years per 15 USC § 78ff(a);
  - Max. supervised release: three years per 18 USC § 3583(b)(2);

- Count four: (ORGH stock) securities fraud per 15 USC § 78j(b);
  - Max. prison: twenty years per 15 USC § 78ff(a);

- o   Max. supervised release: three years per 18 USC § 3583(b)(2);

- Count five: money laundering per 18 USC § 1957(a).

   - o   Max. prison: ten years per 18 USC §§ 1957(a) & (b)(1);[1]

   - o   Max. supervised release: three years per 18 USC § 3583(b)(2).

## THE OFFENSE CONDUCT

Sterritt admitted using a doing-business-as alias to hide his prior conviction. Plea Tr. at 40 (11/27/23) ("I didn't tell Zona investors that my name was Richard Dale Sterritt, Junior [nor that] I had a prior conviction for conspiracy to commit securities fraud 20 years ago"); *id.* at 44 (did "conceal from your potential investors your true name, Richard Sterritt" via the "DBA" of "Richard Richman"); *id.* ("did … conceal or hide from any of these investors that you had been previously convicted of … fraud"); *id.* at 54 ("omitting a material fact and not telling investors that my real name was Richard Dale Sterritt and I did not disclose that I had a prior conviction for conspiracy to commit securities fraud"); *id.* at 56 ("actively conceal your true name and your criminal history"); *id.* at 57 ("I didn't tell investors my name was Richard Dale Sterritt or that I had a prior conviction for conspiracy to commit securities fraud").

Still, numerous investors "continued to invest" after learning Sterritt's real name or about his prior "convict[ion]." 3500-LA-01-003; 3500-RBO-01-001 ("had [he] known that RICHMAN used an alias he would not have invested in ZONA because

---

[1] The "penalty sheet" erroneously stated a twenty-year maximum. Plea Tr. at 26, 30 (11/27/23).

using an alias was a mark of dishonest man[, and he] would not have invested in ZONA if he knew that RICHMAN was a felon who was previously convicted of conspiracy to commit securities fraud" however, he actually *did invest* "in November of 2020 after learning that RICHMAN was STERRITT and went to prison"); 3500-RB-01-003 (found out Sterritt was an "ex-convict" and "immediately booked a flight to Dallas" but "felt a little better" after "meeting" Sterritt and ultimately accepted his "explanation"); 3500-SB-01 ("would have affected [his] investment decision if he knew prior to his investment that STERRITT went to prison for his role as a principal in a conspiracy to commit securities fraud" and he "would have stayed clear of" Sterritt, except that "six months to one year after [his] investment, STERRITT told [him] that he did some time … for stock problems [but that same investor] did not take it too seriously"); 3500-MC-01-001 ("did not recall when he learned about Richard prior criminal conviction, but he was not overly concerned [and though he] would've liked to know … he was not sure how it would have affected his investment"); 3500-AD-01 (if he knew about the "alias, or … that he had been previously convicted [he] would have never invested," except he "invested an additional $120,000" after learning "allegations in the catfishing email such as prison, fraud claims, and his name change," being told the "CIA [] intentionally placed him in jail," and then being "concerned [because] the stories did not add up," and also after getting a "call" from the SEC "inquiring about his ZONA investment").

Mostly, investors did not buy stock directly from, or give money to, Zona. Instead they bought shares of Sterritt-related entities or persons distinct from Zona. Stock purchase agreements stated who investors purchased shares from. GX 142, 224, 260, 334, 336 (6/21/19 amended and restated stock purchase agreements). Within the four corners of those agreements, stock sellers were not obligated to spend sale proceeds in any particular way. Still, nearly all investors informed the government they were told otherwise about how stock investments would be spent.

Most investors were sophisticated or experienced. 3500-LA-01-001 ("had done other successful investments"); 3500-BA-01 ("oral and facial surgeon"); 3500-GB-01-001 ("considered himself a conservative investor"); 3500-PB-01-001 ("lived at [a prominent] Park Ave. [address and] worked as a private banker at" a large well-known bank); 3500-MB-01-001 ("owned a landscaping company [and had an] investment advisor"); 3500-RB-01-001 (had a "portfolio," a "broker," and prior "investment" experience); 3500-RBO-01-001 ("retired fixed income broker who owned his own business for [about] 20 years"); 3500-CCH-01-001 ("worked in trade controlled risk management for" an "energy" company); 3500-MC-01-001 ("lawyer" with a "financial advisor"); 3500-JD-01-001 ("pharmacist who owned two pharmacies and a [] manufacturing business [and who] invested smaller amounts in alternative investments [like] real estate, oil and gas"); 3500-KD-01-001 ("worked in the finance industry [for over 20 years], and had some basic knowledge about the Permian Basin and drilling"); 3500-MD-02-001 ("director of business development" at an "investment" company,

6

and former "oil company" employee); 3500-MD-03-001 ("formerly the CFO of a publicly traded company"); 3500-AD-01-001 ("owned a paper distribution center"); 3500-SE-02-001 ("doctor"); 3500-CF-01-001 ("real estate lawyer"); 3500-SG-01-A-001 ("attorney, estates trusts & wills); 3500-JGI-01-A-002 ("physician"); 3500-AG-01 ("hotel owner" and "an accredited investor" who "considered himself a mid-range investor in terms of sophistication … and had invested in a few startup companies where he purchased the shares directly from the company").

Sterritt admitted to "money laundering" via transactions over "$10,000 … from the sale of Zona Energy shares [where he] knew that the money came from investors as a result of misrepresentations and omissions I made in connection with selling shares of Zona Energy Corporation." Plea Tr. at 60 (11/27/23). Sterritt admitted he "did have conversations with investors and told them [their money] was going to go for oil and gas" development. *Id.* at 48; *id.* at 57 ("I used some of the money for things they were not aware of").

At the same time, very significant amounts of money went to genuine efforts at well drilling, oil or gas production, and legitimate business expenses to run the company. The Court may consider this under § 3553, even if "expenditures, legitimate or not" don't offset guideline "loss." *U.S. v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009); *U.S. v. White*, No. 24-66, 2025 WL 1087073, *2 (2d Cir. Apr. 11, 2025) (same).

Sterritt admitted to "OrgHarvest … matched trades." Plea Tr. at 53. (11/27/23); *id.* at 40 ("I worked with undercover FBI Agent 'Charlie' and Ryan Reynolds to make

the price of OrgHarvest stock increase"); *id.* at 58 ("working with undercover FBI Agent Charlie and Ryan Reynolds to make the price of OrgHarvest stock increase [and] coordinated the sale of OrgHarvest shares in the open market"). Sterritt "stipulate[d]" to count one "overt acts" M, N, and O. *Id.* at 52-53. That included a "May 19, 2020 … pre-arranged matched trade of ORGH shares," a "May 26, 2020 … wire payment of $2,650 to the Undercover … as a kickback for engaging in the ORGH matched trading scheme," and a "May 28, 2020 … matched trade of ORGH shares." ECF No. 177 at 31-32 (S1 indictment).

## THE GUIDELINES

The PSR calculates a "total offense level" of "39." PSR ¶ 132. "Twenty-four" of those "levels" – over 60% – stem from a supposed "$117,022476 … [mostly intended] loss." PSR ¶ 122. The PSR correctly notes "criminal history category [] II." PSR ¶ 136. The PSR thus calculates an advisory range of 292 to 365 months. PSR ¶ 175.

The guidelines are an unfair starting point. "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *U.S. v. Genao*, 869 F. 3d 136, 140 (2d. Cir. 2017). *Booker* requires the Court to only "consider the Guidelines." 543 U.S. 220, 259 (2005). SCOTUS stubbornly insists that "the Guidelines should be the starting point and the initial benchmark." *Peugh v. U.S.*, 569 U.S. 530, 536 (2013). Real-world judging says otherwise, with broad consensus that the guidelines are unduly harsh.

8

Sentencing Commission statistics illustrate the point. Nationally, from "2015" to "2024" the "average … sentence length" for a § "2B1.1" offense ranges from "21" to "24" months.[2] In the "2nd Circuit" the "average" drops to "17" to "22" months.[3] "Average sentence[s]" for "securities" offenders have steady declined from "57" months in "2015" to "38" months in "2024."[4] For "securities" offenders over "60" years-old in "criminal history category II" the national "average" from "2015" to "2024" ranges from "39" to "89" months.[5]

Virtually no § 2B1.1 offenders get the kind of time Sterritt's guidelines call for. Across "56,738" cases from "2015" to "2024" only "25" people got "30" or more years and "26" people got "25" to "30" years.[6] That's 51-people out of 56-thousand. USSC

---

[2] https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited 5/15/25) ("Major Crime Types" then "Economic Crime" then "Sentence Length of Economic Offense Cases Over Time" filtering for "Fiscal Year 2015 – 2024" and "§ 2B1.1").

[3] *Ibid.* (filtering for "2nd Circuit).

[4] *Ibid.* (filtering as noted).

[5] *Ibid.*

[6] https://ida.ussc.gov/analytics/saw.dll?Dashboard (visited 5/15/25) ("Sentencing Outcomes" then "Sentence Length" filtering for "Fiscal Year: 2015,2016,2017,2018,2019,2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All").

reports them as a statistical "0.0%." *Id.* Only "87" people – "0.2%" – got "20" to "25" years.[7] And "0.4%" got "15" to "20" years while only "1.5%" got "10" to "15" years.[8]

Indeed, there's been "a steady widening of the spread between the average guideline minimum and average sentence imposed, with a slight narrowing following the 2015 amendment to the economic offenses guideline … suggesting an overall decline in the influence of the § 2B1.1 guideline over time." USSC, *The Influence of the Guidelines on Federal Sentencing: Economic Crime Offenders (USSG § 2B1.1)* at 32-33 (Dec. 2020).[9] "This is consistent with the findings in the 2012 Booker Report, which showed that the influence of the guideline minimum for fraud offenses had increasingly diminished." *Id.*

*U.S. v. Parris* is instructive. 573 F. Supp. 2d 744 (EDNY 2008). In that multi-million dollar "securities-fraud prosecution" a "jury found each defendant guilty." *Id.* at 745-746. It was a "pump and dump" involving "press releases falsely representing the [company's] business prospects and financial condition." *Id.* "The [defendants] were the sole directors." *Id.* at 747. There was a "a back-dated statement" about the "s[ale of] shares" with a "forged signature" submitted to the "SEC." *Id.* "[O]ver 500 individuals [] purchased [the] stock." *Id.* at 748. Driven by "national … unwarranted

---

[7] *Ibid.*

[8] *Ibid.*

[9] https://www.ussc.gov/research/research-reports/influence-guidelines-federal-sentencing (visited 5/15/25).

sentence disparities," the court gave both defendants "a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life." *Id.* at 745, 751.

"While it may well be that the 25–year sentence for someone like [Bernie] Ebbers—who, as CEO of a major multinational corporation [World Com] with 2.9 billion shares of outstanding stock, was responsible for a $2.2 billion loss to hundreds of thousands of investors—was 'harsh but not unreasonable,' *Ebbers*, 458 F.3d at 130, any comparable sentence meted out to" Sterritt "would, in contrast, be unreasonable as a matter of law." *Id.* at 755.

A person who shoots a stranger dead on the street faces 262 to 327 months. USSG § 2A1.2 (second degree murder, base offense level 38 in CHC II). For "sexually exploiting a minor by production of sexually explicit visual [] material" it's 135 to 168 months. USSG § 2G2.1 (base offense level 32 in CHC II). Yet Sterritt faces 292 to 365 months.

## THE COURT MUST REJECT THE INTENDED LOSS FIGURE

The PSR improperly tags Sterritt with an "intended loss of at least $100,000,000." PSR ¶¶ 110. "The ordinary meaning of 'loss' in the context of § 2B1.1 is 'actual loss'." U.*S. v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022). "Because the commentary expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss,' [the Court must] accord the commentary no weight." *Id.* at 258. Nor can the Court deploy "Amendment 827" which "moves the general rule establishing loss as

11

the greater of actual loss or intended loss from the commentary to the guideline itself as part of the Notes, … effective … November 1, 2024."[10] That's because "*the Ex Post Facto Clause* is violated when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher sentencing range than the version in place at the time of the offense." *Peugh v. U.S.*, 569 U.S. 530 (2013).

Amendment 827 explicitly says where "changes" are "technical, stylistic" or "nonsubstantive," or where the amendment merely "clarify[ies]" existing law.[11] Notably, Amendment 827 exists in "*Banks*'" wake only to "ensure consistent loss calculation across circuits."[12] Indeed, "the Commission may undertake a comprehensive review of §2B1.1 in a future amendment cycle, [so] this amendment aims to ensure consistent guideline application in the meantime without taking a position on how loss may be calculated in the future." *Id.*

To the extent the 2nd Circuit disagrees with *Banks*, it's wrong and should be overruled. *U.S. v. Rainford*, 110 F.4th 455, 475 (2d Cir. 2024) ("the guideline does not contradict the understanding expressed in the commentary that 'loss' encompasses intended loss"). The 2nd Circuit has not yet considered whether "the Supreme Court's

---

[10] https://www.ussc.gov/guidelines/amendment/827 (visited 5/19/25).

[11] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf at 4, 22, 30, 31, and 44 (visited 5/19/25); *compare to id.* at 8 to 18 (declining to characterize the "intended loss" amendment as such).

[12] https://www.ussc.gov/guidelines/amendment/827 (visited 5/19/25).

recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 [citation omitted] (2024), precludes continuing reliance on the Guidelines commentary." *U.S. v. Kukoyi*, 126 F.4th 806, 812 (2d Cir. 2025).

The Court must also reject the PSR's use of "intended loss amount based on the conspiracy guideline, which requires sentencing courts to consider 'any intended offense conduct' when applying any enhancements from the guideline for the substantive offense." *Id., citing* U.S.S.G. § 2X1.1(a); PSR ¶¶ 101, 110.

Under "§ 2X1.1(a) … intended offense conduct [must] be established with reasonable certainty." *Id*. Section "2B1.1(b)(1)" requires "a reasonable estimate of the loss." *Rainford*, 110 F.4th at 476. The government cannot meet either standard. The government points to two "recorded calls between Sterritt and the UC" to "establish [] intended loss." ECF No. 463 at 2 – 3 (gov. PSR letter). One on "March 30" and another on "April 15, 2020." *Id*. (referring to GX 1027, 1028, and 1033).

GX 1027 and 1028 span approx. 40 minutes[13] wherein UC repeatedly pesters Sterritt about how many shares to sell. GX-1028-AT-002 ("what I need to know from you Rich is how much stock you want to get out of"); GX-1028-AT-012 ("you need to think about … how much stock you want to get out of and over what period of time"): *id*. ("but you just need to let me know how much stock you want to get out of"); GX-

---

[13] GX 1027 and 1028 are one conversation broken up into two separate calls because the phone connection dropped about 14 minutes in.

1028-AT-022 ("like I told you, all I need to know is how much stock are you going to want to put away over what period of time").

Sterritt responds, "how much money we need or we want to get out of that's up to you all." GX-1028-AT-004; GX-1028-AT-005 ("I mean it's up to you what you want us to get out of it"). Sensing trouble, UC pivots back. *Id.* ("So, so I, I think Rich it's up to you to, to tell me, like -- because I'm doing this deal for you, right?"). It's not Sterritt who suggests "60 million" shares – it's the *cooperator*, presumably coached. *Id.*

When Sterritt asks "can you do 60 million" shares, it's an actual question, not a declarative statement of present intent. *Id.* When Sterritt echoes that "we *could* do the whole 60 million" it's explicitly tied to a precondition that "the stock price is" then going to be legitimately "justified by the … revenues of the companies" hopefully to be "acqu[ired]." GX-1028-AT-006-007 (emphasis supplied). Sterritt's "biggest fear is" that the stock "jumps up" too high "and gets way too far ahead of itself" because that would jeopardize "future acquisitions" or legitimate growth. GX-1028-AT-008. Sterritt highlights "lockup" periods where stockholders cannot sell within a "statutory period" to *prevent* "100 million shares hitting your market" – the supposed 'dump' in a pump-and-dump. GX-1027-AT-009. They clearly plot matched trades, but at that moment Sterritt does not want to 'dump' "60 million shares … in [] total loss to investors." ECF No. 463 at 2 – 3 (gov. PSR letter).

The April 15 call is more of the same with UC pushing Sterritt to agree to sell everything. "So let, let – let's just talk about high level wise here about like how, how -

14

- what are you looking to get out of and, and -- so it looks like you've got like -- you control about 62 million … you have that, that amount of shares to play with … what are you looking to get dollar value wise like from my brokers to put away?" GX-1033-ET-001-002. "Like how much -- how much are you -- how much are you looking to get out of stock wise"? *Id.* Despite UC's best effort, apparently, the 60-million-shares figure *wasn't* Sterritt's actual intent as he stammers "I -- you know, I, I -- you know, I - I, I would say you -- you get -- we could get out of, you know, at least 40 to 50 million shares." *Id.* UC keeps trying to repeat the "50 million" shares – as if it's suddenly now more real than the 60-million figure was. GX-1033-ET-002-003; GX-1033-FT-001-002. Meanwhile Sterritt would rather talk about grand plans for "acquisitions." *Id.* Over and over, UC is desperate for a "50 million" commitment while Sterritt goes along, often with one-word utterances like "yeah," "okay," and "mm-hmm." GX-1033-ET; GX-1033-FT.

Even according to the government, Sterritt vacillates wildly about what might be sold, from "60 million" to "forty" or "fifty million shares." ECF No. 463 at 2 – 3 (gov. PSR letter). This strongly undercuts an inference that Sterritt truly formed a real intent about future action. Never mind how unrealistic it all was, and § 2B1.1 app. n. 3(A)(ii)'s view on impossibility. On one hand, the government paints Sterritt as serially full of nonsense – nothing he says is reliable or accurate. On the other hand, the Court is supposed to mine these two calls to turn Sterritt's acquiescence into genuine *mens rea* to sell 100 million dollars of stock.

15

Sterritt blusters often, but UC steers things as related to the instant stock trading. Sterritt often looks to him for direction. GX 1027-AT-007-008 ("we've only deposited one block of stock … there is five million shares in it right now [and] you got to tell me whether you want me to put more shares and,  and get it ready because I -- you know, I was going to grow the thing with an orderly market."); GX-1028-AT-018-019 ("I mean let me ask you this, do you think I should -- if we're going to do it all, do you think I should go ahead -- because it's hard to get these shares deposited… [d]o you think I should go ahead and start depositing the rest of the shares?"); GX-1033-BT-002 (asking UC "if you want me to put more shares in").

In a pump-and-dump without a UC, broker-participants generally don't formally agree ahead of time how much stock to sell. The corrupt broker simply sells as instructed and takes his commission. The *only* reason for UC to box Sterritt into how many shares to sell is to spike sentencing exposure.

There are "situations in which exploitative manipulation of sentencing factors by government agents might overbear the will of a person predisposed only to committing a lesser crime." *U.S. v. Nieves-Velez*, 28 F. Supp. 3d 131, 134 (D.P.R. 2014) (citations omitted). "This danger seems especially great in cases where the accused's sentence depends in large part on the quantity [of drugs or loss] involved." *Id.* So-called "[s]entencing factor manipulation" thus "occurs when the government improperly enlarge[s] the scope or scale of [a] crime' to secure a longer sentence than would otherwise obtain." *Id.* at 133 (citations omitted). And "[a] finding of sentencing factor

16

manipulation authorizes a sentencing court to depart from the guideline sentencing range, as well as from statutory minimums." *Id.*

The "Second Circuit has" implicitly "recognized the validity of" this and related "doctrines" albeit "never formally." *U.S. v. Oliveras*, 359 F. App'x 257, 261 (2d Cir. 2010);[14] *U.S. v. Reyes-Navarette*, 408 F. App'x 474, 476 (2d Cir. 2011) ("need not decide whether to recognize the validity of the sentencing manipulation doctrine at this time"); *U.S. v. Viera*, No. 21-957-CR, 2022 WL 1468164, *2 (2d Cir. May 10, 2022) (have not formally "recognized sentencing manipulation and … if we were to do so, it would require a showing of outrageous misconduct"). Of course, formal departure isn't required to consider *any* level of sentencing manipulation in § 3553's context.

## THE COURT MUST REJECT THE ACTUAL LOSS FIGURE

The government has not established actual loss by preponderant evidence. Investors received *both* "stock" that became ERF Wireless, *and* "limited partnership interests" in "Zona 73-1 Partners, LP" related to the "working interest in the well … in Pecos County, Texas known as Escalera 73 #1 Well." GX 142, 224, 260, 334, and 336. ERF Wireless last traded in Jan. 2025 for 8 cents per share.[15] Even without current trading volume, that doesn't necessarily mean the company has no value whatsoever.

---

[14] *See also, Oliveras* at fn. 5 ("[o]ur sister Circuits have adopted widely different positions on the availability of the sentencing manipulation and sentencing entrapment doctrines") (collecting cases).

[15] https://finance.yahoo.com/quote/ERFB/ (visited 6/3/25).

For example, the company provided wireless services to the energy industry for many years. Their intellectual property and customer base are still valuable. Plus, even an inoperative public shell company can sell for hundreds of thousands of dollars.[16] There's a significant market for such reverse merger transactions.[17] Similarly, the government has not established that the partnership is worth nothing. There is a capped well with valuable natural resources underneath. Neither the stocks nor the partnership interest were worthless when the SEC halted trading or when the government made arrests.

*U.S. v. Leonard* is instructive. 529 F.3d 83, 93 (2d Cir. 2008). "The district court computed the loss amount as equal to the entire cost of the securities sold by the appellants, on the ground that the members would not have invested had they realized the true size of the sales commissions." *Id.* "Although we defer to the district court's determination that the members would not have purchased the investment had they known that 45% of the sales price went toward commissions, this does not, in and of itself, mean that the securities the investors received in exchange for their contributions were entirely without value." *Id.* "After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture." *Id.* "Accordingly,

---

[16] http://www.venturevest.com/shellsreversemerger.html (visited 6/3/25) ("the cost can range from $70,000 to $700,000"); https://www.publicfinancial.com/how-much-does-a-reverse-merger-cost (visited 6/3/25) ("[g]enerally speaking, a controlling interest in an OTC QB shell can be acquired for $350,000").

[17] https://dealstream.com/financial/public-shells (visited 6/3/25).

the district court erred in not deducting from the purchase price the actual value of the instruments." *Id.; but see, U.S. v. Stitsky,* 536 F. App'x 98, 112 (2d Cir. 2013) ("because investors received nothing of value at the time the fraud was uncovered, the district court reasonably estimated the loss to be the principal amount invested," and siding with *Byors* over *Leonard*).

## SECTION 3553 COMPELS LENIENCY

Sterritt is 69-years-old and in very poor health, suffering from "asthma, chronic obstructive pulmonary disease (COPD), chronic bronchitis, allergies, high blood pressure, heart disease, gastrointestinal, cholesterol related concerns, and diabetes." PSR ¶ 151. Sterritt also reports needing a CPAP sleep-apnea machine, plus having chronic rhinitis, ulcerative colitis, dermatitis, rosacea, gout, cervical disc disorder of the back, thoracic, thoracolumbar and lumbar acre disc disorder, enlarged prostrate, testicular distortion and dysfunction, epistaxis, loop recorder, atrial fibrillation, hyperlipidemia, major depressive disorder, anxiety disorder, attention deficit hyperactivity disorder, and hypertension. *See,* Second PSR Objection Letter (4/10/25) at 1-2. He requires dozens of medications. PSR ¶ 151; *see,* Second PSR Objection Letter (4/10/25) at 1-2.

His medical history is lengthy, including hernias, neck injuries from a car accident, concussive hospitalization after a bad fall, plus another bad fall and potential stroke. PSR ¶¶ 152-153. He's had "bypass surgery" with "three subsequent surgeries to

address an infection [where a]s a result, all his ribs were removed and replaced with titanium ones." PSR ¶ 154. He had *another* "coronary artery bypass grafting" and *another* car accident prompting a "drug-induced coma for 21 days." PSR ¶¶ 154-156. At "MDC" he's had other "heart" and medical issues that present difficulties given the institutional setting. PSR ¶¶ 157-160; *see infra* (discussing harsh confinement conditions).

Additionally, Sterritt reports previously having a large bump, the size of half a watermelon on his chest, resulting from a car hitting him after heart bypass surgery. A surgery last year removed the growth.

## **EXTREME PRETRIAL CONFINEMENT MERITS LENIENCY**

"Sterritt was arrested on April 14, 2021 in Dallas, Texas and … detained." ECF No. 24 at 1 (detention memo). "On April 21, 2021, [a] Magistrate Judge for the Northern District of Texas … released" him. *Id.* On May 6, 2021, the Court overruled the Texas release and detained Sterritt. ECF No. 37 (detention order).

At a county jail, Sterritt relays that he was wrongfully placed with COVID positive inmates. He soon tested positive and went to a single quarantine cell, filled with deep standing water and rats. After 12 days he went to the hospital, unable to have a bowel movement. Sterritt was bizarrely told he needed to throw away his bible in order to continue his journey to EDNY jail. Upon arrival at the next jail he was hospitalized again, now in Greenville, still with no bowel movement, and with a large ventricle hernia and bowel blockage. Next came another solitary confinement cell, for medical

20

observation. He was deemed too fragile for general population. Then a cell next to the physician's office at a Grady County, Oklahoma, jail. He slept on the floor and eventually went to another hospital, which revealed a spot on his lungs. Still no bowel movement.

Sterritt's been at MDC "since June 23, 2021." PSR ¶ 143. As just some examples, Sterritt indicates that upon arrival at MDC he felt severe pain in his right arm and heart but nobody came for over an hour, while other inmates banged on doors yelling for help. After moving to a different unit, he recalls using the computer while several violent fights broke out next to him. He recalls one instance where an inmate grabbed a fire extinguisher to defend himself against gang members and sprayed numerous people in the computer area. Sterritt recalls being sprayed in the face, trying to get to the door for air, and collapsing on the recreation deck. Sterritt recalls laying on the ground for over 35-minutes before being taken to a hallway – not a hospital – because of staffing shortages. Sterritt describes only being able to get his inhaler because a particular officer who knows him decided to help.

On other occasions Sterritt recalls two bad slip-and-falls on wet floors without warning signs, leaving him with hip injuries and using a wheelchair or cane[18] for extended periods. Sterritt describes being extorted several times by other inmates. He describes violent threats with weapons, shanks, and even a long sword-like object.

---

[18] Counsel's recent in-person observations of Sterritt include needing a cane.

Sterritt asserts that inadequate medical treatment is a constant. "[I]t is one problem after another and given his age it is not a safe environment for him." PSR ¶ 162.

His discovery was thrown out on at least three separate occasions, and to date has not been replaced. For long stretches he had no computer access, whether due to technical issues or gang-control of the computers.

As recently as the end of May, Sterritt describes three separate incidents where inmates violently hit others in the head with locks in socks. Another inmate burned someone with hot water and oil. A unit-82-inmate ran past a guard and brutally attacked two others, resulting in an officer spraying him and the whole unit with pepper spray.

Sterritt's already served about the length of an average securities fraud sentence (*supra*) in an abhorrent environment. Sterritt describes recurring patterns of violence, extortion, arbitrary discipline, unsanitary surroundings, and staff indifference. He's not alone. The "dangerous, barbaric conditions" are an "extrinsic factor" that "loom[] large in nearly every bail and sentencing determination made in this judicial district." *U.S. v. Colucci*, 743 F.Supp.3d 452, 453-455 (EDNY, Aug. 5, 2024) ("steady drumfire" alleging "inhumane treatment at MDC … often uncontested by prosecutors").

Sterritt's MDC stretch coincided with notable instances of "deteriorating living conditions [including] no access to water, [] spotty electricity and lack [of] hot food[, plus] staff shortages").[19] Of course, it's all in addition to 'normal' MDC lockdowns,

---

[19] Natalie Hernandez, *After latest reports of dangerous conditions at MDC, advocate calls for outside regulatory authority*,    NY1    (10/13/21),    https://www.ny1.com/nyc/all-boroughs/inside-city-

violence, medical indifference, reduced programming and access to counsel, spoiled food, et cetera. *Colucci*, 743 F.Supp.3d at 461 ("counsel routinely raise the issue in a shorthand fashion, as lawyers and judges have grown weary of extended articulation"); *U.S. v. Chavez*, 710 F.Supp.3d 227, fn.3 (SDNY, Jan. 4, 2024) ("[t]here are far too many cases to cite").

Such sentencing relief is not a new concept. *U.S. v. Carty*, 264 F.3d 191, 193 (2d Cir. 2001) (over 20-years ago, "remand so that the court can reconsider the defendant's request for a downward departure for pre-sentence conditions of confinement"). "The issues at MDC are not limited to circumstances that were necessitated by the COVID pandemic." *Id.*; *Chavez*, 710 F.Supp.3d at 228 ("near-perpetual lockdowns no longer explained by COVID-19").

But it bears emphasis that much of Sterritt MDC time *was* under pandemic conditions. As of *at least* spring 2023 BOP "[i]nstitutions [still] determine[d] their operational level (Level 1, Level 2, or Level 3) based on [] indicators of COVID-19." *U.S. v. Domenick Ricciardo*, 21 CR 466, ECF No. 474 at 16-17, fn. 15 (EDNY) (6/1/23 sentencing memo, visiting BOP's "modified operations guide" on 4/19/23). "At each level, … modification to operations (such as inmate programming and services) may be made to mitigate the risk and spread of COVID-19." *Id.* "BOP COVID-19 Operational

---

hall/2021/10/14/metropolitan-detention-center-in-brooklyn-nyc-reports-dangerous-conditions-david-patton-discussion (visited 5/16/25).

Levels" – red, yellow, and green – "are raised or lowered after 48 hours of respective sustained increases or decreases in the [relevant] indicators." *Id.* Even "yellow" levels mean "limit[ed] capacity" for "commissary / inmate phones / Trulincs [email], … barber shop, … laundry, … law library, … education programs, … psychology services, … religious services, … recreation, … visitation, … and work detail." *Id.* Moreover, "[m]any other general modifications … are in effect due to COVID-19, regardless of the facilities current operation level," such as "quarantine[s or] medical isolation." *Id.*

Pandemic or not, "it has become routine for judges in both the Southern District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." *Colucci*, 743 F.Supp.3d at 455*, citing Chavez*, 710 F.Supp.3d at 229. For some judges, "it's essentially the equivalent of either time and a half or two times what would ordinarily be served."[20] For others "[t]he torment [] faced in pretrial custody was punishment enough."[21]

---

[20] Stephen Rex Brown, *NYC federal jail is so bad inmates get 'time and a half': Judge*, New York Daily News (May 24, 2021), https://www.nydailynews.com/2021/05/24/nyc-federal-jail-is-so-bad-inmates-get-time-and-a-half-judge/ (visited 5/16/25), referring to *U.S. v. Daniel Gonzalez*, 18 CR 669 (SDNY) (docket notation: "[s]entencing held on 4/2/2021 for Daniel Gonzalez [who is] sentenced to time served").

[21] Shayna Jacobs, *Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions*, Washington Post (May 7, 2021), https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-acd3-24b44a57093a_story.html (visited 5/16/25) (former SDNY Chief "U.S. District Court Judge … castigated [BOP], saying the agency's ineptitude … at [MCC] in Manhattan and [MDC] in Brooklyn amounted to the 'single thing in the five years that I was chief judge of this court that made me the craziest'"), referring to *U.S. v. Tiffany Days*, 19 CR 619 (SDNY) (docket notation: "[s]entencing held … 4/29/2021 for Tiffany Days").

The question isn't whether to trim Sterritt's sentence, it's by how much. *U.S. v. Gezer*, 16 CR 282, ECF No. 65 at 12 (SDNY, May 8, 2019) ("I do take account, of the fact that you have now been incarcerated for a full three years in circumstances that were difficult … It is appalling that I have to add to that list [of mitigating sentencing factors] the Metropolitan Detention Center, but I do have to add to that list the Metropolitan Detention Center, where for the last six months, at least, if not longer, the conditions of incarceration have been hellish and unworthy of this country"); *U.S. v. Bruney*, 18 CR 542, ECF No. 32 at 24-25 (EDNY, Feb. 27, 2019) ("I think punishment has been extreme in this case because of the conditions already endured by this defendant as well as other inmates at the MDC so I think that his sentence in some way in terms of punishment has been longer than the actual time, the chronological period of time he is going to serve"); *U.S. v. Ozols*, 16 CR 692, ECF No. 234 at 30-31 (SDNY, Feb. 12, 2019) ("[f]inally, I do believe and will give Mr. Ozols some [sentencing] credit for what he endured at the MDC … [because] the conditions that I read about are the conditions that one associates with a third world country and not a country like this, and nobody in detention, whether convicted, not convicted, awaiting sentencing, should have to endure that as the detainees did at the MDC"); *U.S. v. Rodriguez-Lopez*, 18 CR 868 (SDNY, June 10, 2019); *U.S. v. Acosta*, 18 CR 667 (EDNY, June 4, 2019).

The Court must consider whether "time spent in custody has [] been harsher than usual." *U.S. v. Boccanfuso*, 15 CR 341, 2023 WL 3741980, *4 (SDNY, May 31, 2023) (18 USC § 3582(c)(1)(A) sentence reduction given "unusually harsh conditions of

25

confinement")*, citing U.S. v. Rodriguez*, 492 F. Supp. 3d 306, 311 (SDNY 2020) ("health risks, lockdowns, and restrictions on services have made incarceration harsher and more punitive than would otherwise have been the case").

Indeed, *any* harsh confinement variable can merit sentencing leniency.[22] Thus, the Court must consider how much "harder" Sterritt's "time" has been because "[t]he Court should seek proportionality… no matter how strongly it condemns a defendant's behavior" since we "calibrate punishment by varying the length of a prison term, not its severity." *Volpe*, 78 F. Supp. 2d at 88.

Despite challenges, Sterritt's been productive in jail, earning numerous BOP programming certificates. They are attached along with support letters.

---

[22] For example, departure can ground in "status as a deportable alien that [leads to an] unwarranted increase in the severity of [] sentence" if contract-facilities are "not eligible for any early release, [] not [] able to serve [their] sentence in a minimum security prison, and [] may not qualify for reduced credits for participation in a residential drug or alcohol abuse program." *U.S. v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205 (DNM 2005); *U.S. v. Wedd*, 15 CR 616, ECF No. 809 at 4 (SDNY, April 9, 2021) ("initially contemplated sentencing Wedd to 168 months, [but] she considered that [because he was a noncitizen] he would be serving his time in a facility where he would not get time off for good behavior and where he would not have the benefit of certain programs," ultimately giving him to 120 months). As another example, former police officers' "susceptibility to prison abuse" is a departure basis "well within the sound discretion of the District Court." *Koon v. U.S.*, 518 U.S. 81, 106-112 (1996); *U.S. v. Volpe*, 78 F. Supp.2d 76, 87-89 (EDNY 1999) (government acknowledged authority to depart downward for police officer "vulnerable to abuse in prison" resulting in a "two-level downward departure under § 5K2.0"); *U.S. v. Bruder*, 103 F.Supp.2d 155, 183 (EDNY 2000) (two-level departure for *Volpe's* co-defendant).

## CONCLUSION

The Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with" § 3553.

Dated:       June 4, 2025
              New York, NY

Respectfully submitted,

*/S/ Robert Caliendo*

_____
Robert Caliendo, Esq.
Tel. (646) 668-5615
rc@caliendo-law.com